**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **MOTOROLA, INC.** | ) | FILED: AUGUST 8, 2008 |
|  | ) | 08CV4512 |
|  | ) | JUDGE ZAGEL |
| **Plaintiff,** | ) | MAGISTRATE JUDGE KEYS |
| **v.** | ) | JFB |
|  | ) | **Case No.** _____ |
| **MICHAEL FENGER,** | ) |  |
|  | ) |  |
| **Defendant.** | ) |  |
|  | ) |  |

## MICHAEL FENGER'S NOTICE OF REMOVAL

Defendant Michael Fenger, by his counsel, hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, from the Circuit Court of Cook County, County Department, Chancery Division, to the United States District Court for the Northern District of Illinois.

1.    On July 17, 2008, Plaintiff Motorola, Inc. ("Plaintiff") filed a complaint for injunctive relief and other relief in the Circuit Court of Cook County, County Department, Chancery Division styled <u>Motorola, Inc. v. Michael Fenger</u>, Case No. 08 CH 25742. Plaintiff served Mr. Fenger with service of process on July 21, 2008. A true copy of the Complaint and all exhibits thereto are attached as Exhibit 1.

2.    The Complaint purports to assert Illinois state law claims for breach of contract and threatened misappropriation of trade secrets and confidential information. <u>See</u> Compl. ¶¶ 37-48. Plaintiff claims that Mr. Fenger "is breaching or threatens to breach at least one of his agreements" with Plaintiff, and that he has "actually misappropriated and/or threatens to inevitably misappropriate" Plaintiff's trade secrets. <u>See id.</u> ¶¶ 40, 44. Plaintiff seeks

injunctive relief, as well as damages in excess of $1,000,000.  See id. at 14-15 (Prayer for Relief ¶¶ B, C, D).

3.    Plaintiff is a Delaware corporation, with its principal place of business in Schaumburg, Illinois.  See Compl. ¶ 6.

4.    Defendant is an individual who resides in Los Altos Hills, California.  See id. ¶ 5.

5.    Plaintiff's claims are removable, because there is complete diversity of citizenship between the parties, and because the matter in controversy exceeds the sum or value of $75,000.  See 28 U.S.C. §§ 1332(a), 1441(a).

6.    The parties are citizens of different states.  For purposes of removal under 28 U.S.C. § 1441, Plaintiff is deemed to be a citizen of Delaware and Illinois.  See 28 U.S.C. § 1332(c)(1);  see also Compl. ¶ 6.  Defendant is a citizen of California, where he resides.  See Compl. ¶ 5.

7.    On the face of the Complaint, there are claimed damages in excess of $1,000,000 at issue.  Plaintiff expressly demands that Mr. Fenger return monies allegedly received under his purported agreements with Plaintiff of "a figure in excess of $1,000,000.00 and additional amounts to be determined at trial."  Id. at 14 (Prayer for Relief ¶ C).  Plaintiff also demands exemplary damages in an unspecified amount.  Id. at 14 (Prayer for Relief ¶ D). Finally, Plaintiff seeks injunctive relief.  Id. at 14 (Prayer for Relief ¶ A).

8.    The Notice of Removal is properly filed in the United States District Court for the Northern District of Illinois, because the Circuit Court of Cook County, County Department, Chancery Division is located in this judicial district.  See 28 U.S.C. § 1441(a).

9.      The Notice of Removal is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.  See 28 U.S.C. § 1446(a).

10.      Plaintiff served Defendant with the Complaint on July 21, 2008. Accordingly, this Notice of Removal is timely under 28 U.S.C. § 1446(b) because the 30 day limitation has not yet expired.  See 28 U.S.C. § 1448; see also Collins v. Pontikes, 447 F. Supp. 2d 895, 897 (N.D. Ill. 2006) (quoting Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 353-56 (1999)).

11.      Pursuant to 28 U.S.C. § 1446(a), a copy of the Complaint, and all exhibits to the Complaint, are attached.  See Ex. 1 hereto.  A copy of all other process, pleadings and orders known to Fenger in this action will be provided promptly to the Court.

12.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiff and a copy, along with a Notice of Filing of the Notice of Removal, is being filed with the Circuit Court of Cook County, County Department, Chancery Division.

WHEREFORE, for the foregoing reasons, Mr. Fenger respectfully requests that this Court exercise jurisdiction over this action and enter orders and grant relief as may be necessary to secure removal and to prevent further proceedings in this matter in the Circuit Court of Cook County, County Department, Chancery Division.  Mr. Fenger further requests such other and further relief as the Court deems appropriate.

Dated:  August 8, 2008

Respectfully submitted,


___/s/ Matthew L. Kutcher_____
One of the Attorneys for Defendant Michael Fenger


Timothy B. Hardwicke
Matthew L. Kutcher
Catherine K. Dick
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Phone: (312) 876-7700
Fax: (312) 993-9767

## CERTIFICATE OF SERVICE

I, Catherine K. Dick, hereby certify that on August 8, 2008, I served a copy of Michael Fenger's NOTICE OF REMOVAL TO UNITED STATES DISTRICT COURT via hand delivery, upon:

> Michael D. Wexler
> Justin K. Beyer
> SEYFARTH SHAW LLP
> 131 South Dearborn Street
> Suite 2400
> Chicago, Illinois 60603

/s/Catherine K. Dick
Catherine K. Dick

```
FILED: AUGUST 8, 2008
08CV4512
JUDGE ZAGEL
MAGISTRATE JUDGE KEYS

JFB
```

# EXHIBIT 1

FILED - 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

MOTOROLA, INC.
a Delaware Corporation,

    Plaintiff,

    v.

MICHAEL FENGER, an individual,

    Defendant.

)
)
)
)
)
)
)
)
)

Case No.

**08CH25742**

Hon.

*William Maki*

## COMPLAINT FOR INJUNCTIVE RELIEF AND OTHER RELIEF

Plaintiff, MOTOROLA, INC. ("Motorola") brings this Complaint against, Defendant MICHAEL FENGER ("Fenger"), and for its causes of action, states as follows:

## INTRODUCTION

Despite being paid millions of dollars in cash, restricted stock units, and stock options in exchange for Fenger's simple agreement not to take a position with a competitor during the two years following his departure from the role as Senior Vice President of Mobile Devices of Europe, Middle East, and Africa ("EMEA") at Motorola, Fenger willfully and deliberately violated the reasonable non-compete agreements which he agreed to in writing while employed by Motorola.   Fenger accepted a position with Apple Inc. ("Apple"), as its Vice President, Global iPhone Sales, a direct competitor of Motorola.  In his new position, not only will Fenger be in violation of his numerous written agreements with Motorola, he will also be in a position in which he cannot perform his duties for Apple without inevitably disclosing Motorola's trade secrets.   Additionally, on information and belief, in Fenger's new position with Apple, he has aided Apple, directly or indirectly, in the hiring of two former Motorola employees, both valued, high-level employees, who are in possession of trade secret information and have access to Motorola's customer relationships.  Finally, based on the non-compete agreements in his various

stock-option contracts, Motorola is entitled to recoup payments made on vested and executed stock-options contracts. Hence, Motorola seeks injunctive relief to protect its trade secrets, confidential information, and customer relationships, to require Fenger to honor his legally-binding contractual obligations, and to protect Motorola's work force from further poaching.

## NATURE OF ACTION

1. This is an action for breach of contract and threatened misappropriation of trade secrets. Motorola seeks injunctive relief and other damages.

2. Fenger, the former Senior Vice President of Mobile Devices of EMEA (as well as other positions putting him in either physical or mental possession of Motorola's trade secrets, confidential information, and customer relationships), is violating and will continue to violate express contractual obligations owed to Motorola, by which he agreed not to accept a competing position with a competitor of Motorola, not to solicit Motorola employees to join a competitor, and to affirmatively maintain the confidentiality of Motorola's proprietary information. In exchange for these obligations, Fenger was employed, paid monies, restricted stock units, and stock options worth million of dollars. Specifically, in violation of his obligations, on or about March 31, 2008, Fenger accepted a position as Vice President, Global iPhone Sales for Motorola's competitor, Apple, and in that position he will inevitably disclose or utilize Motorola's trade secrets and confidential information.

3. Motorola seeks to enjoin Fenger from rendering services to Motorola's competitor Apple for two years; soliciting or hiring Motorola employees; and from utilizing or disclosing Motorola's confidential information. Additionally, Motorola seeks repayment of stock options paid out and contingent upon Fenger's compliance with his non-compete agreement with Motorola.

## PARTIES, JURISDICTION, AND VENUE

4.      Fenger is the former Senior Vice President of Mobile Devices.  Fenger began his employment with Motorola on or about September 23, 2002 as Corporate Vice President, Corporate Initiatives Group.  Fenger held a number of executive level positions within Motorola, all with access to the most confidential and highly sensitive information, including his last position as Senior Vice President of Mobile Devices for EMEA.  Prior to joining Motorola, Fenger had no experience in the telecommunications industry.  Upon Fenger being employed by Motorola, and at numerous points throughout his employment with Motorola, Fenger received stock options, restricted stock units, and monies worth millions of dollars in exchange for his agreement that he would not work for a competitor for a specified period of time, that he would not solicit Motorola employees, and that he would not utilize or disclose Motorola's confidential information.  Fenger voluntarily resigned from Motorola on or about March 2008.

5.      Fenger worked for Motorola in its Schaumburg, Cook County, Illinois office, has and is conducting business in this venue, and entered into certain stock option contracts here. Moreover, Fenger signed numerous stock-option agreements, pursuant to which he agreed that venue and jurisdiction is proper and exclusive in Illinois.  On information and belief, Fenger resides at 23500 Toyonita Road, Los Altos Hills, California, 94024.

6.      Plaintiff, Motorola, is a Delaware corporation with its principal place of business and world headquarters in Schaumburg, Cook County, Illinois.

7.      Motorola employs numerous employees in Cook County, Illinois and conducts business in Cook County, Illinois worth millions of dollars each year which is at risk due to Fenger's actions.

CH1 11491941.1

8.     Motorola is a global communications provider which provides seamless mobility products, solutions and services across broadband, embedded systems, and wireless networks. Motorola consists of four business units including Connected Home Solutions, Government and Enterprise Mobility Solutions, Mobile Devices, and Networks.

## BACKGROUND

9.     For many years, Motorola has been an international leader in communications technology.  Motorola's success is derived from many components, but, in particular, Motorola develops proprietary, cutting-edge technology, products, customer initiatives, business strategies, communication solutions and customer-support strategies, along with merger-and-acquisition strategies, which are not publicly known.  A critical factor in Motorola's success has been the evolution of its Mobile Devices business.

10.     Motorola's Mobile Devices business delivers capabilities in cellular, wireless broadband, and wireline access technologies.  The Mobile Devices business designs, integrates, and markets mobile technology through its communication, data management, and mobile entertainment devices.  Motorola designs, manufactures, sells, and services wireless handsets, as well as licensing its vast portfolio of intellectual property.  Motorola's devices span all cellular and wireless systems and include integrated software applications as well as a large complement of Bluetooth®-enabled accessories.

11.     Motorola is a leader in customer support and service through the use of a well-trained staff, the use of technology, and the establishment of strong customer relationships.

12.     Motorola has invested millions of dollars to create proprietary designs, solutions, initiatives, and equipment to insure that Motorola can provide cutting-edge technologies and services to its customers.

13.     Motorola also spends extensive time and millions of dollars toward: identifying and maintaining key customer relationships; designing customer initiatives; identifying vendors; determining strategic mergers, acquisitions, and divestures; allotting resources for new technologies and initiatives; creating multiyear product and business plans called T2 and T3 plans, respectively; identifying and developing leader and talent plans called T1 plans; and identifying resources that should be redirected to more promising initiatives.

14.     In fact, Motorola's key management personnel, which included Fenger, participate extensively in the design and implementation of Motorola's T2 and T3 plans. For example, Motorola's T2 plan identifies product development efforts and launches over a three-year period thereby focusing research and development efforts, marketing initiatives, and customer strategies. The T2 plan is utilized in all Motorola business units, including Mobile Devices. Fenger also participated in and had access to T1 plans identifying talented individuals and leadership development initiatives.

15.     Motorola has purchased through acquisitions and, on its own, developed and maintained valuable, near-permanent relationships and substantial goodwill with its customers.

16.     In order to grow its business and better serve its customers, Motorola has acquired other entities and technology throughout the world to best provide products and services that meets its clients' needs and from which Motorola can derive economic gain.

17.     Motorola's business information, long-standing or near-permanent customer relationships and goodwill are of paramount significance to its business reputation and its success.

## EVENTS GIVING RISE TO THIS ACTION

18.     Fenger joined Motorola on or about September 23, 2002.  Prior to joining Motorola, Fenger had no experience in the communications industry.  In his role as Corporate Vice President, Corporate Initiatives, Fenger was a member of Motorola's Senior Leadership Team and as such attended high-level meetings and was privy to the most sensitive of Motorola proprietary information.

19.     Upon joining Motorola, Fenger received stock options worth millions of dollars and was provided access to Motorola's proprietary and confidential information.  In exchange for employment, receiving the restricted stock units, stock options, and confidential information, Fenger was required and, in fact, executed a Stock Option Consideration Agreement dated September 23, 2002 and accepted on October 14, 2002 (hereinafter the "September 23, 2002 Stock Option Consideration Agreement").  A copy of the document is attached as Exhibit 1.

20.     In order to protect Motorola's trade secrets, proprietary information, goodwill, and customer relationships, pursuant to the September 23, 2002 Stock Option Consideration Agreement, Fenger agreed for a period of two years following his termination of employment from Motorola not to engage in any activity as a director, officer, employee, manager or otherwise, in connection with the manufacture, development, marketing, promotion or sale of any product or technological development competitive with any products or technological developments with respect to which Fenger's work was directly concerned during the two years preceding his termination of employment from Motorola or about which he learned confidential information.  Fenger also agreed that he would not solicit, induce, or recruit Motorola employees away from Motorola or disclose Motorola's confidential information.  The September 23, 2002 Stock Option Consideration Agreement also entitles Motorola to injunctive relief and the return

CHI 11491941.1

6

of Motorola's vested and unvested options as well as a portion of the monies received for exercised options.

21.     On eight additional occasions (specifically on May 6, 2003, May 4, 2004, twice on May 3, 2005 (for two separate agreements), May 6, 2006, March 9, 2007, May 8, 2007, and October 16, 2007) and in consideration for continued employment, stock options, restricted stock units, and/or monies, Fenger executed additional stock option agreements. A copy of each is attached as Exhibits 2 through 9, respectively. Based on these various agreements, Fenger agreed to protect Motorola's trade secrets, proprietary information, goodwill, and customer relationships. Fenger further agreed not to compete against Motorola, not to solicit Motorola employees, and not to utilize or disclose Motorola's confidential information. Finally, Fenger agreed to return a portion of monies received for exercised options, if he breached the agreements, agreed to a forfeiture of Motorola's vested and unvested options, and injunctive relief.

22.     On or about September 14, 2002, Fenger also executed an Employment Agreement with Motorola in which he agreed not to disclose confidential information of Motorola. A copy of the Employment Agreement is attached as Exhibit 10. Further, Fenger also executed an acknowledgement that he would abide by Motorola's Code of Conduct, which also required Fenger to maintain the confidentiality of Motorola's proprietary information. A copy of the acknowledgement is attached as Exhibit 11. Finally, Fenger was provided with copies of Motorola's Protection of Proprietary Information policy and Motorola's Appropriate Use of Computer Software policy. Copies of these policies are attached as Exhibit 12.

23.     In or about July 2007 Fenger was promoted to Senior Vice President of Mobile Devises for EMEA of Motorola. In that role, Fenger was a member of the executive team of the

Mobile Devices business, he attended high-level meetings at Motorola and was privy to the most sensitive of Motorola proprietary information, especially regarding the Mobile Devices business.

24.    Because Fenger was placed in such a high-level position with access to virtually all of Motorola's confidential information regarding research and development, marketing, strategy, customer contacts, target acquisitions, merger opportunities, possible divestures, allocation of resources, pricing, margins, profitability, customer initiatives, leadership and talent initiatives and other proprietary information, Fenger received even more restricted stock units and stock options. Once again, Fenger promised upon receiving the restricted stock units and options that he would not compete with Motorola for two years, he would not solicit employees for two years and he would not utilize or disclose Motorola's confidential information. Further, the additional agreements also provided for the forfeiture of certain restricted stock units and options upon breaches of the agreements.

25.    Because Fenger had no background in the communications industry, Motorola trained Fenger and provided him access to confidential information about Motorola, its products, research, and strategies. In particular, Fenger attended operation review meetings, technology review meetings, strategic planning meetings, and customer review meetings.

26.    Through numerous restricted stock units and stock option grants, Fenger was made a multi-millionaire in exchange for his simple promise that he would not compete for two years, solicit employees, or utilize or disclose Motorola's confidential information.

27.    In or around March 2008, Fenger voluntarily resigned from Motorola. Following Fenger's resignation, Motorola learned that Fenger had been hired as Apple's Senior Vice President, Global iPhone Sales, a position similar in scope and nature to his position with Motorola.

CHI 11491941.1

8

28.    Like Motorola, Apple also designs, implements, and markets mobile devices. On information and belief, Apple also allocates its resources, responds to market conditions, and makes strategic plans. Apple's website claims it delivers innovative technology solutions encompassing broadband, multimedia services, and wireless broadband.

29.    Fenger will be violating his agreements by working at Apple and he cannot perform his job at Apple without inevitably disclosing or utilizing Motorola's trade secrets and proprietary information. Motorola's trade secrets include: leader identification and talent planning (T1); multi-year product planning (T2); strategic business planning (T3); resource allocation; products under development; strength and weaknesses of products, including switches; intelligent call management; embedded computing technology and push-to-talk technology; customer initiatives; customer relationship strengths and weaknesses; pricing and margins; acquisition targets and divesture plans; and business growth strengths and weaknesses.

30.    While employed by Motorola, Fenger had day-to-day contact with customers, vendors, and proprietary information. He was privy to the pricing, margins, customer initiatives, allocation of resources, product development, multi-year product, business, and talent planning, and strategies being utilized by Motorola, which would give Fenger and Apple an unfair advantage in soliciting customers, utilizing vendors, and developing products.

31.    Motorola's trade secret information is not generally known in the industry and is valuable because Motorola derives economic value from the information in part because such information is not publicly available. Motorola's trade secret business and customer information is of great value to Motorola and such information would give any competitor, who improperly acquired such information, an unfair competitive advantage by: not expending the time and resources to develop the trade secret information as Motorola has done; quickly developing

CHI 11491941.1

products and technologies to unfairly compete with Motorola in order to diminish Motorola's head start; and even alerting a competitor as to initiatives that should not be pursued; and other improper advantages.

32.    Motorola protects its trade secret business and customer information by requiring employees to keep confidential business and customer information, by password protecting computers, by limiting access to information, by requiring employees to sign confidentiality agreements, and by requiring employees to sign an acknowledgement requiring employees to review and abide by its Code of Conduct.

33.    Motorola's customer relationships and goodwill are of paramount importance to Motorola in that many of Motorola's customers have been customers of Motorola for quite some time and are near permanent.  Moreover, in a number of instances, Motorola's customers entrust Motorola with confidential information and require Motorola to enter into confidentiality agreements as well.

34.    Moreover, on information and belief, Fenger solicited, hired, or aided Apple in the solicitation and hiring of two Motorola employees, who possess Motorola's trade secrets, confidential information, and access to customer relationships.

35.    Fenger's actions are a serious threat to Motorola's business, are in violation of contractual obligations and applicable law, and unjustly enrich Fenger.

36.    Motorola has no adequate remedy at law to fully protect it.  If Fenger's actions go unchecked, he will necessarily diminish the value of Motorola's trade secret and confidential information, deplete Motorola's work force, diminish its goodwill, negatively impact customer

relationships, give Apple a strategic advantage as to where to allocate or not allocate resources, and exploit the knowledge of Motorola's product strengths and weaknesses.

## COUNT I

## BREACH OF CONTRACT

37.    Motorola hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 36.

38.    Fenger's agreements are valid and enforceable contracts.  The post-employment activity covenants, confidentiality covenants, and other provisions contained in the agreements are reasonable in scope and duration and are reasonably necessary to protect legitimate protectable interests in trade secrets, confidential information, customer relationships, work force, and goodwill.

39.    Motorola has fully performed all of its obligations under the Agreements.

40.    Fenger is breaching or threatens to breach at least one of his agreements in at least one of the following ways by:

    A.    accepting his position with Apple;

    B.    on information and belief, directly or indirectly soliciting, selling to, or rendering services to customers of Motorola with whom he worked or learned confidential information about during the two years prior to termination of employment at Motorola;

    C.    on information and belief, diverting customers from Motorola;

    D.    on information and belief, directly or indirectly, hiring, soliciting, or inducing employees of Motorola to leave Motorola's employ on Apple's behalf;

    E.    on information and belief, disclosing or utilizing Motorola's confidential and proprietary information; or

F.      failing to return to Motorola restricted stock units, stock options and/or monies.

41.     As a result of any one of these breaches of his agreements, Motorola has been injured and faces irreparable injury.  Motorola is threatened with losing customers, technology, its competitive advantage, its trade secrets and goodwill in amounts which may be impossible to determine, and its work force unless Fenger is enjoined and restrained by order of this Court.

## COUNT II

## THREATENED MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION

42.     Motorola hereby repeats and realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 36.

43.     The proprietary business and customer information of Motorola constitutes trade secrets because Motorola derives independent economic value from that information, such information is neither generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

44.     Fenger has actually misappropriated and/or threatens to inevitably misappropriate Motorola's trade secrets without Motorola's consent in violation of the Illinois Trade Secrets Act. 765 ILCS 1065 *et seq.*  Fenger cannot serve as Senior Vice President of Global Sales of IPhone for Apple without utilizing and disclosing Motorola's confidential information.  This is especially true because Fenger had no prior knowledge of or training regarding the communications industry before joining Motorola.  Fenger cannot separate out Motorola's trade secrets from his daily duties at Apple.

45.    Fenger has become employed by Apple or will serve functions at Apple similar to his previous roles at Motorola and, thus, will inevitably utilize or disclose Motorola's trade secrets and/or confidential information.

46.    Fenger will be unjustly enriched by the misappropriation of Motorola's trade secrets and/or confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire, and/or otherwise misappropriate Motorola's trade secrets and confidential information.

47.    Upon information and belief, Fenger's threatened misappropriation has been willful and malicious in light of his repeated execution of contracts prohibiting his current conduct and his deliberate violation of the contractual obligations.

48.    As a result of the threatened misappropriation of Motorola's trade secrets, Motorola has been injured and faces irreparable injury.  Motorola is threatened with losing customers, technology, its competitive advantage, its trade secrets and goodwill in amounts which may be impossible to determine, and work force unless Fenger is enjoined and restrained by order of this Court, as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Motorola prays for the following relief:

A.    That Fenger, along with his respective agents, employers, employees, attorneys, and those persons in active concert or participation with him, be enjoined from:

      1.    directly or indirectly being employed by Apple Inc. as its Senior Vice President for Global Sales of iPhones for two years beginning March 31, 2008;

      2.    directly or indirectly contacting or selling products or technology competitive with Motorola's products or technology to any customer of

Motorola for two years beginning March 31, 2008 with whom Fenger worked or learned confidential information about during the two years preceding March 31, 2008;

3.      directly or indirectly disclosing or utilizing Motorola's confidential and proprietary information; and

4.      directly or indirectly soliciting, hiring, or seeking to cause any employee of Motorola to leave its employ or aiding, in any manner, any company or group from soliciting, hiring, or seeking to cause any employee of Motorola to leave its employ;

B.      That Motorola be awarded compensatory damages it has suffered, in an amount to be proven at trial and in excess of $50,000;

C.      That Fenger be ordered to return to Motorola all monies due Motorola as a result of Fenger violating his Stock Option Consideration Agreements, and other agreements, including, but not limited to, a figure in excess of $1,000,000.00 and additional amounts to be determined at trial;

D.      That Motorola be awarded exemplary damages as provided for by statute for willful and malicious conduct;

E.      That Motorola be awarded attorney's fees and the costs of this action as permitted by law; and

F.      That Motorola be awarded such other and further relief as the Court deems equitable and just.

Respectfully submitted,

MOTOROLA, INC.

By: _____
        One of Its Attorneys

Michael D. Wexler
Justin K. Beyer
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603
(312) 460-5000
Firm I.D. No. 90747

Dated: July 17, 2008

# EXHIBIT 1

R3 Award Document                                          Page 1 of 8

## How to use this document

The first thing you will see on this website is your Option Award Document. This shows the date you were notified at the top of the first page and describes most of the terms under which the options are granted. It is important to read the Award Document carefully, though it is not necessary that you sign it.

From the Award Document you will scroll down to the Stock Option Consideration Agreement ("SOCA"). Please read the SOCA carefully to help you decide whether you wish to accept its terms to receive the Option Award. After reviewing the SOCA, you are required to "sign" the SOCA as a condition of the grant. In other words, the options will not become yours unless you sign the SOCA within 30 days of the date of your email notification for this option grant.

At the bottom of the SOCA, there is a place for you to indicate that you either "Accept" or "Reject" its terms. "Signing" and agreeing to be bound by the terms of the SOCA will be done by you when you write "Accept" in the appropriate box and confirm your choice by clicking the "Accept" button. If you write and click that you "Accept," all the terms of the SOCA will apply and the SOCA will be a binding contract between you and Motorola. If you "Reject," the options will revert back to Motorola and will NOT become yours. You will forfeit them permanently. If you exit this site without having marked either the "Accept" or "Reject" button, nothing will happen for the first 30 days following the date of your email notification for this option grant. But if you have still not taken action within 30 days of the date of your email notification, your inaction will be treated as a "Reject" and on the 31st day after the date of your email notification you will forfeit the options permanently.

If you "Accept" the SOCA and thus receive the options, you will be able to view both the Award Document and the signed SOCA on the website in the future. Even so, we strongly recommend that that you print out a hard copy of the Award Document and the accepted SOCA for your records. If you "Reject" the SOCA or do nothing and thus forfeit the options, on the 31st day of the date of your email notification you will lose the ability to access any information on the website regarding these options. To print the Award Document, right click now. Select "Print" from the list. Select the desired printer and click "Print." (NOTE: YOU WILL NOT HAVE ACCESS TO THIS INTERNAL WEB SITE ONCE YOU LEAVE MOTOROLA.)

R3 Award Document

# MOTOROLA, INC.
## AWARD DOCUMENT
### For the
## COMPENSATION/ACQUISITION PLAN OF 2000
### Terms and Conditions Related to Employee Nonqualified Stock Options
### Award ID: 370629

| Name : | Michael Fenger | Expiration Date : | September 23, 2012 |
|---|---|---|---|
| Commerce ID : | 12028663 | Number of Options : | 125,000 |
| Grant Date : | September 23, 2002 | Exercise Price : | $ 10.48 (USD) |

Motorola, Inc. ("Motorola") is pleased to grant you options to purchase shares of Motorola's common stock under the Motorola Compensation/Acquisition Plan of 2000 (the "Plan"). The number of options ("Options") awarded to you and the Exercise Price per Option, which is the Fair Market Value on the Date of Grant, are stated above. Each Option entitles you to purchase one share of Motorola's common stock on the terms described below and in the Plan.

## Vesting Schedule

| Percentage | Date |
|---|---|
| 10.00 | September 23, 2003 |
| 20.00 | September 23, 2004 |
| 30.00 | September 23, 2005 |
| 40.00 | September 23, 2006 |

**Vesting and Exercisability**

You cannot exercise the Options until they have vested.

*Regular Vesting* The Options will vest in accordance with the aforementioned schedule (subject to the other terms hereof):

*Special Vesting* You may be subject to the Special Vesting Dates described below if your employment or service with Motorola or a Subsidiary (as defined below) terminates.

*Exercisability* You may exercise Options at any time after they vest and before they expire as described below.

**Expiration**

All Options expire on the earlier of

(1) the tenth anniversary of the Date of Grant as stated above or

(2) any of the Special Expiration Dates described below. Once an Option expires, you no longer have the right to exercise it.

**Special Vesting Dates and Special Expiration Dates**

There are events that cause your Options to vest sooner than the schedule discussed above or to expire sooner than the tenth anniversary of the Date of Grant. Those events are as follows:

Motorola Confidential Proprietary

(End of page 1 of the Award Document)

R3 Award Document

*Retirement* If your employment or service with Motorola or a Subsidiary is ended because of your Retirement, Options that were granted at least one year prior to your Retirement that are not vested will automatically become fully vested upon your Retirement. Any remaining unvested Options will be forfeited. All your vested Options will then expire on the earlier of the third anniversary of ending your employment or service because of your Retirement or the Date of Expiration stated above. Retirement means your retirement from Motorola or a Subsidiary as follows:

*(i)* Retiring at or after age 55 with 20 years of service;

*(ii)* Retiring at or after age 60 with 10 years of service;

*(iii)* Retiring at or after age 65, without regard to years of service.

*Disability* If your employment or service with Motorola or a Subsidiary is terminated because of your Total and Permanent Disability (as defined below), Options that are not vested will automatically become fully vested upon your termination of employment or service. All your Options will then expire on the earlier of the third anniversary of your termination of employment or service because of your Total and Permanent Disability or the Date of Expiration stated above. Until that time, the Options will be exercisable by you or your guardian or legal representative.

*Death* If your employment or service with Motorola or a Subsidiary is terminated because of your death, Options that are not vested will automatically become fully vested upon your death. All your Options will then expire on the earlier of the third anniversary of your death or the Date of Expiration stated above. Until that time, with written proof of death and inheritance, the Options will be exercisable by your legal representative, legatees or distributees.

*Change In Control* If there is a Change In Control of Motorola (as defined in the Plan), all the unvested Options will automatically become fully vested as described in the Plan. If Motorola or a Subsidiary terminates your employment or service other than for Serious Misconduct within two years of consummation of a Change In Control, all of your vested Options will be exercisable until the Date of Expiration.

*Termination of Employment or Service Because of Serious Misconduct* If Motorola or a Subsidiary terminates your employment or service because of Serious Misconduct (as defined below) all of your Options (vested and unvested) expire upon your termination.

*Change in Employment in Connection with a Divestiture* If you accept employment with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfers of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary (a "Divestiture"), all of your unvested Options will automatically expire upon termination in direct connection with a Divestiture and your vested Options will expire 12 months after such Divestiture or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service by Motorola or a Subsidiary Other than for Serious Misconduct or a Divestiture* If Motorola or a Subsidiary on its initiative, terminates your employment or service other than for Serious Misconduct or a Divestiture, all of your unvested Options will automatically expire upon termination and your vested Options will expire twelve months after your termination of employment or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service for any Other Reason than Described Above* If your employment or service with Motorola or a Subsidiary terminates for any reason other than that described above, including voluntary resignation of your employment or service, all of your Options (vested and unvested) will automatically expire on the date of termination.

**Leave of Absence/Temporary Layoff**

If you take a Leave of Absence from Motorola or a Subsidiary that your employer has approved in writing in accordance with your employer's Leave of Absence Policy and which does not constitute a termination of employment as determined by Motorola, or you are placed on Temporary Layoff (as defined below) by Motorola or a Subsidiary the following will apply:

*Vesting of Options* Options will continue to vest in accordance with the vesting schedule set forth above.

*Exercising Options* You may exercise Options that are vested or that vest during the leave of absence or layoff.

Motorola Confidential Proprietary

(End of page 2 of the Award Document)

*Effect of Termination of Employment or Service* If your employment or service is terminated during the Leave of Absence or Temporary Layoff, the treatment of your Options will be determined as described under "Special Vesting Dates and Special Expiration Dates" above.

### Other Terms

*Method of Exercising* You must follow the procedures for exercising options established by Motorola from time to time. At the time of exercise, you must pay the Exercise Price for all of the Options being exercised and any taxes that are required to be withheld by Motorola or a Subsidiary in connection with the exercise. Options may not be exercised for less than 50 shares unless the number of shares represented by the Option is less than 50 shares, in which case the Option must be exercised for the remaining amount.

*Transferability* Unless the Committee provides, Options are not transferable other than by will or the laws of descent and distribution.

*Tax Withholding* Motorola or a Subsidiary is entitled to withhold an amount equal to the required minimum statutory withholding taxes for the respective tax jurisdictions attributable to any share of common stock deliverable in connection with the exercise of the Options. Employee may satisfy any withholding obligation in whole or in part by electing to have Motorola retain Option shares having a Fair Market Value on the date of exercise equal to the minimum amount required to be withheld.

### Definition of Terms

If a term is used but not defined, it has the meaning given such term in the Plan.

*Fair Market Value* is the closing price for a share of Motorola common stock on the last trading day before the grant. The official source for the closing price is the New York Stock Exchange Composite Transaction as reported in the Wall Street Journal, Midwest edition.

*Serious Misconduct* means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

*Subsidiary* means an entity of which Motorola owns directly or indirectly at least 50% and that Motorola consolidates for financial reporting purposes.

*Total and Permanent Disability* means for (x) U.S. employees, entitlement to long-term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations.

*Temporary Layoff* means a layoff or redundancy that is communicated as being for a period of up to twelve months and as including a right to recall under defined circumstances.

### Consent to Transfer Personal Data

By accepting this award, you voluntarily acknowledge and consent to the collection, use, processing and transfer of personal data as described in this paragraph. You are not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect your ability to participate in the Plan. Motorola, its Subsidiaries and your employer hold certain personal information about you, that may include your name, home address and telephone number, date of birth, social security number or other employee identification number, salary, nationality, job title, any shares of stock held in Motorola, or details of all options or any other entitlement to shares of stock awarded, canceled, purchased, vested, unvested or outstanding in your favor, for the purpose of managing and administering the Plan ("Data").

Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of your participation in the Plan, and Motorola and/or any of its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, such as the United States. You authorize them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on your behalf to a broker or other third party with whom you may elect to deposit any shares of stock acquired pursuant to the Plan. You may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing your consent may affect your ability to participate in the Plan.

R3 Award Document

#### Acknowledgement of Discretionary Nature of the Plan; No Vested Rights

You acknowledge and agree that the Plan is discretionary in nature and limited in duration, and may be amended, cancelled, or terminated by Motorola or a Subsidiary, in its sole discretion, at any time. The grant of awards under the Plan is a one-time benefit and does not create any contractual or other right to receive an award in the future. Future grants, if any, will be at the sole discretion of Motorola, including, but not limited to, the timing of any grant, the amount of the award, vesting provisions, and the exercise price.

#### Agreement Following Termination of Employment

As a further condition of accepting the Options, you acknowledge and agree that for a period of two years following your termination of employment or service, you will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of Motorola or a Subsidiary to terminate his/her employment with Motorola or a Subsidiary and/or to seek employment with your new or prospective employer, or any other company.

You agree that upon termination of employment with Motorola or a Subsidiary, you will immediately inform Motorola of

*(i)* the identity of your new employer (or the nature of any start-up business or self-employment),

*(ii)* your new title, and

*(iii)* your job duties and responsibilities.

You hereby authorize Motorola or a Subsidiary to provide a copy of this Award Document to your new employer. You further agree to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine your compliance with the terms hereof.

#### Acceptance of Terms and Conditions

By accepting the Options, you agree to be bound by these terms and conditions, the Plan and any and all rules and regulations established by Motorola in connection with awards issued under the Plan.

#### Other Information about Your Options and the Plan

You can find other information about options and the Plan on the Motorola website http://hr2.mot.com/stockadmin. If you do not have access to the website, please complete the order form included with these Terms and Conditions to receive the information.

Motorola Confidential Proprietary

(End of page 4 of the Award Document)

R3 Award Document ( ( 

☒ Motorola, Inc.

**Printed: March 12, 2008**

# STOCK OPTION CONSIDERATION AGREEMENT

**Grant Date: September 23, 2002**

The following Agreement is established to protect the trade secrets, intellectual property, confidential information, customer relationships and goodwill of Motorola, Inc. and each of its subsidiaries (the "Company") both as defined in the Motorola Omnibus Incentive Plan of 2000, as amended (the "2000 Plan").

As sole consideration for the stock option(s) granted to me on the date shown above under the terms of the 2000 Plan, the Motorola Incentive Plan of 1998 (the "1998 Plan"), the Motorola Compensation/Acquisition Plan of 2000 (the "C/A Plan") [or the Motorola Omnibus Incentive Plan of 2002 (the "2002 Plan")], as the case may be ("the Covered Options"), and as a person with a salary grade of EXB and/or as a Motorola appointed vice president or elected officer, I agree to the following:

(1)  I agree that during the course of my employment and thereafter, I will not use or disclose, except on behalf of the Company and pursuant to its directions during the course of my employment, any Company Confidential Information. Confidential Information means information concerning the Company and its business that is not generally known outside the Company. Confidential Information includes: (i) trade secrets; (ii) intellectual property; (iii) the Company's methods of operation and Company processes; (iv) information regarding the Company's present and/or future products, developments, processes and systems, including invention disclosures and patent applications; (v) information on customers or potential customers, including customer's names, sales records, prices, and other terms of sales and Company cost information; (vi) Company personnel data; (vii) Company business plans, marketing plans, financial data and projections; and (viii) information received in confidence by the Company from third parties. Information regarding products or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company or one of its affiliates is considering for broader use, shall not be deemed generally known until such broader use is actually commercially implemented.

(2)  I acknowledge and agree that for a period of two years following my termination of employment, I will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of those activities, any employee of the Company to terminate his/her employment with the Company and/or to seek employment with my new or prospective employer, or any other company.

(3)  I understand that by accepting the Covered Options, (i) if I violate the terms of paragraphs 1 or 2 of this Agreement, or (ii) if during a period of two years following the termination of my employment for any reason I engage in activities which are the same as or similar to activities in which I engaged at any time during the two years preceding termination of my employment, for any person, company or entity in connection with products, services or technological developments (existing or planned) that are the same as, similar to, or competitive with, any products, services or technological developments (existing or planned) on which I worked at any time during the two years preceding the termination of my employment, then:

   (a)  all of my vested and unvested Covered Options will terminate and no longer be exercisable; and

   (b)  for all Covered Options exercised within two years prior to the termination of my employment or anytime after termination of my employment, I will immediately pay to the Company the difference between the option price and the market price of the Company's common stock on the date of exercise (the "spread").

Paragraph 3(ii) applies in the countries in or for which I have performed work at any time during the two years preceding termination of my employment.

(4)  The requirements of this agreement can be waived or modified only upon the prior written consent of Motorola, Inc. I acknowledge that the promises in this Agreement, not any employment of or services performed by me in the course and scope of that employment, are the sole consideration for the Covered Options.

(5)  I agree that upon termination of employment with the Company and for a period of two years thereafter, I will immediately inform the Company of (i) the identity of my new employer (or the nature of any start-up business, consulting arrangements or self-employment), (ii) my new title, and (iii) my job duties and responsibilities. I hereby authorize the Company to provide a copy of this Agreement to my new employer. I further agree to provide information to the Company as may from time to time be requested in order to determine my compliance with the terms of this Agreement.

(6)  I acknowledge that the harm caused to the Company by the breach or anticipated breach of paragraphs 1 and/or 2 of this Agreement may be irreparable and I agree the Company may have injunctive relief against me in addition to and cumulative with any other rights and remedies the Company may have pursuant to this Agreement, any other agreements between me and the Company for the protection of the Company's Confidential Information, or law, including the recovery of liquidated damages. I agree that any interim or final equitable relief entered by a court of competent jurisdiction will, at the request of the Company, be entered on consent and enforced by any court having jurisdiction over me. This relief would occur without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

(7)  If any provisions contained in this Agreement shall be determined by a court of competent jurisdiction to be overly broad as to scope of activity, duration or territory, I consent to any request by the Company to such court to interpret

R3 Award Document

such provision by limiting or reducing it to be enforceable to the extent compatible with then applicable law. If any one or more of the terms, provisions, covenants or restrictions of this Agreement are determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. However, and without regard to the foregoing, if paragraphs 1, 2 and 3 herein, or either of them, is not enforceable or otherwise invalid, the consideration I am providing Motorola for the Covered Options would fail. I agree that all of my Covered Options will terminate and that, I will pay Motorola the spread on any Covered Options exercised within two years prior to the termination of my employment or anytime after termination of my employment.

(8)    I accept the terms of this Agreement and the above option(s) to purchase shares of the Common Stock of the Company, subject to the terms of this Agreement, the 1998 Plan, the 2000 Plan, the C/A Plan [or the 2002 Plan], as the case may be, and any Award Document issued pursuant to one of those Plans. I am familiar with the 1998 Plan, the 2000 Plan, the C/A Plan [or the 2002 Plan] and agree to be bound by it, the actions of the Compensation Committee and the actions of the Company's Board of Directors.

(9)    I agree that this Agreement and the 1998 Plan, the 2000 Plan, the C/A Plan [or the 2002 Plan], as the case may be, and any Award Document issued pursuant to one of those Plans, together constitute an agreement between the Company and me. I further agree that this Agreement is governed by the laws of Illinois, without giving effect to principles of Conflicts of Laws, and any legal action related to this Agreement shall be brought in any federal or state court located in Illinois, USA.

I accept the jurisdiction of these courts and consent to service of process from said courts solely for legal actions related to this Agreement and stock option(s) offer.

*(End of the Consideration Agreement)*

R3 Award Document

**The recipient has accepted the terms of the Agreement on October 14, 2002**

EXHIBIT 2

R3 Award Document

**How to use this document**

The first thing you will see on this website is your Option Award Document. This shows the date you were notified at the top of the first page and describes most of the terms under which the options are granted. It is important to read the Award Document carefully, though it is not necessary that you sign it.

From the Award Document you will scroll down to the Stock Option Consideration Agreement ("SOCA"). Please read the SOCA carefully to help you decide whether you wish to accept its terms to receive the Option Award. After reviewing the SOCA, you are required to "sign" the SOCA as a condition of the grant. In other words, the options will not become yours unless you sign the SOCA within 30 days of the date of your email notification for this option grant.

At the bottom of the SOCA, there is a place for you to indicate that you either "Accept" or "Reject" its terms. "Signing" and agreeing to be bound by the terms of the SOCA will be done by you when you write "Accept" in the appropriate box and confirm your choice by clicking the "Accept" button. If you write and click that you "Accept," all the terms of the SOCA will apply and the SOCA will be a binding contract between you and Motorola. If you "Reject," the options will revert back to Motorola and will NOT become yours. You will forfeit them permanently. If you exit this site without having marked either the "Accept" or "Reject" button, nothing will happen for the first 30 days following the date of your email notification for this option grant. But if you have still not taken action within 30 days of the date of your email notification, your inaction will be treated as a "Reject" and on the 31st day after the date of your email notification you will forfeit the options permanently.

If you "Accept" the SOCA and thus receive the options, you will be able to view both the Award Document and the signed SOCA on the website in the future. Even so, we strongly recommend that that you print out a hard copy of the Award Document and the accepted SOCA for your records. If you "Reject" the SOCA or do nothing and thus forfeit the options, on the 31st day of the date of your email notification you will lose the ability to access any information on the website regarding these options. To print the Award Document, right click now. Select "Print" from the list. Select the desired printer and click "Print." (NOTE: YOU WILL NOT HAVE ACCESS TO THIS INTERNAL WEB SITE ONCE YOU LEAVE MOTOROLA.)

R3 Award Document

# MOTOROLA, INC.
## AWARD DOCUMENT
### For the
### Motorola Omnibus Incentive Plan of 2000
### Terms and Conditions Related to Employee Nonqualified Stock Options
### Award ID: 482214

| Name : | Michael Fenger | Expiration Date : | May 06, 2013 |
|---|---|---|---|
| Commerce ID : | 12028663 | Number of Options : | 100,000 |
| Grant Date : | May 06, 2003 | Exercise Price : | $ 8.13 (USD) |

Motorola, Inc. ("Motorola") is pleased to grant you options to purchase shares of Motorola's common stock under the Motorola Omnibus Incentive Plan of 2000 (the "Plan"). The number of options ("Options") awarded to you and the Exercise Price per Option, which is the Fair Market Value on the Date of Grant, are stated above. Each Option entitles you to purchase one share of Motorola's common stock on the terms described below and in the Plan.

## Vesting Schedule

| Percentage | Date |
|---|---|
| 25.00 | May 06, 2004 |
| 25.00 | May 06, 2005 |
| 25.00 | May 06, 2006 |
| 25.00 | May 06, 2007 |

### Vesting and Exercisability

You cannot exercise the Options until they have vested.

*Regular Vesting* The Options will vest in accordance with the aforementioned schedule (subject to the other terms hereof).

*Special Vesting* You may be subject to the Special Vesting Dates described below if your employment or service with Motorola or a Subsidiary (as defined below) terminates.

*Exercisability* You may exercise Options at any time after they vest and before they expire as described below.

### Expiration

All Options expire on the earlier of (1) the Date of Expiration as stated above or (2) any of the Special Expiration Dates described below. Once an Option expires, you no longer have the right to exercise it.

### Special Vesting Dates and Special Expiration Dates

There are events that cause your Options to vest sooner than the schedule discussed above or to expire sooner than the Date of Expiration as stated above. Those events are as follows:

*Retirement* If your employment or service with Motorola or a Subsidiary is ended because of your Retirement, Options that were granted at least one year prior to your Retirement that are not vested will automatically become fully vested upon your Retirement. Any remaining unvested Options will be forfeited. All your vested Options will then expire on the earlier of the third anniversary of ending your employment or service because of your Retirement or the Date of Expiration stated above. Retirement means (only for purposes of this Option) your retirement from Motorola or a Subsidiary as follows:

(i) Retiring at or after age 55 with 20 years of service;

(ii) Retiring at or after age 60 with 10 years of service;

(iii) Retiring at or after age 65, without regard to years of service.

*Disability* If your employment or service with Motorola or a Subsidiary is terminated because of your Total and Permanent Disability (as defined below), Options that are not vested will automatically become fully vested upon your termination of employment or service. All your Options will then expire on the earlier of the third anniversary of your

R3 Award Document

termination of employment or service because of your Total and Permanent Disability or the Date of Expiration stated above. Until that time, the Options will be exercisable by you or your guardian or legal representative.

*Death* If your employment or service with Motorola or a Subsidiary is terminated because of your death, Options that are not vested will automatically become fully vested upon your death. All your Options will then expire on the earlier of the third anniversary of your death or the Date of Expiration stated above. Until that time, with written proof of death and inheritance, the Options will be exercisable by your legal representative, legatees or distributees.

*Change In Control* If there is a Change In Control of Motorola (as defined in the Plan), all the unvested Options will automatically become fully vested as described in the Plan. If Motorola or a Subsidiary terminates your employment or service other than for Serious Misconduct within two years of consummation of a Change In Control, all of your vested Options will be exercisable until the Date of Expiration stated above.

*Termination of Employment or Service Because of Serious Misconduct* If Motorola or a Subsidiary terminates your employment or service because of Serious Misconduct (as defined below) all of your Options (vested and unvested) expire upon your termination.

*Change in Employment in Connection with a Divestiture* If you accept employment with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfer of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary (a "Divestiture"), all of your unvested Options will automatically expire upon termination in direct connection with a Divestiture and your vested Options will expire 12 months after such Divestiture or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service by Motorola or a Subsidiary Other than for Serious Misconduct or a Divestiture* If Motorola or a Subsidiary on its initiative, terminates your employment or service other than for Serious Misconduct or a Divestiture, all of your unvested Options will automatically expire upon termination and your vested Options will expire twelve months after your termination of employment or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service for any Other Reason than Described Above* If your employment or service with Motorola or a Subsidiary terminates for any reason other than that described above, including voluntary resignation of your employment or service, all of your Options (vested and unvested) will automatically expire on the date of termination.

### Leave of Absence/Temporary Layoff

If you take a Leave of Absence from Motorola or a Subsidiary that your employer has approved in writing in accordance with your employer's Leave of Absence Policy and which does not constitute a termination of employment as determined by Motorola, or you are placed on Temporary Layoff (as defined below) by Motorola or a Subsidiary the following will apply:

*Vesting of Options* Options will continue to vest in accordance with the vesting schedule set forth above.

*Exercising Options* You may exercise Options that are vested or that vest during the leave of absence or layoff.

*Effect of Termination of Employment or Service* If your employment or service is terminated during the Leave of Absence or Temporary Layoff, the treatment of your Options will be determined as described under "Special Vesting Dates and Special Expiration Dates" above.

### Other Terms

*Method of Exercising* You must follow the procedures for exercising options established by Motorola from time to time. At the time of exercise, you must pay the Exercise Price for all of the Options being exercised and any taxes that are required to be withheld by Motorola or a Subsidiary in connection with the exercise. Options may not be exercised for less than 50 shares unless the number of shares represented by the Option is less than 50 shares, in which case the Option must be exercised for the remaining amount.

*Transferability* Unless the Committee provides, Options are not transferable other than by will or the laws of descent and distribution.

*Tax Withholding* Motorola or a Subsidiary is entitled to withhold an amount equal to the required minimum statutory withholding taxes for the respective tax jurisdictions attributable to any share of common stock deliverable in connection with the exercise of the Options. You may satisfy any withholding obligation in whole or in part by electing

(End of page 2 of the Award Document)

R3 Award Document

to have Motorola retain Option shares having a Fair Market Value on the date of exercise equal to the minimum amount required to be withheld.

## Definition of Terms

If a term is used but not defined, it has the meaning given such term in the Plan.

"Fair Market Value" is the closing price for a share of Motorola common stock on the last trading day before the date of grant or date of exercise, whichever is applicable. The official source for the closing price is the New York Stock Exchange Composite Transaction as reported in the Wall Street Journal, Midwest edition.

"Serious Misconduct" means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

"Subsidiary" means an entity of which Motorola owns directly or indirectly at least 50% and that Motorola consolidates for financial reporting purposes.

"Total and Permanent Disability" means for (x) U.S. employees, entitlement to long-term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations.

"Temporary Layoff" means a layoff or redundancy that is communicated as being for a period of up to twelve months and as including a right to recall under defined circumstances.

## Consent to Transfer Personal Data

By accepting this award, you voluntarily acknowledge and consent to the collection, use, processing and transfer of personal data as described in this paragraph. You are not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect your ability to participate in the Plan. Motorola, its Subsidiaries and your employer hold certain personal information about you, that may include your name, home address and telephone number, date of birth, social security number or other employee identification number, salary, nationality, job title, any shares of stock held in Motorola, or details of all options or any other entitlement to shares of stock awarded, canceled, purchased, vested, or unvested, for the purpose of managing and administering the Plan ("Data"). Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of

implementation, administration and management of your participation in the Plan, and Motorola and/or its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, including the United States. You authorize them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on your behalf to a broker or other third party with whom you may elect to deposit any shares of stock acquired pursuant to the Plan. You may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing your consent may affect your ability to participate in the Plan.

## Acknowledgement of Discretionary Nature of the Plan; No Vested Rights

You acknowledge and agree that the Plan is discretionary in nature and limited in duration, and may be amended, cancelled, or terminated by Motorola or a Subsidiary, in its sole discretion, at any time. The grant of awards under the Plan is a one-time benefit and does not create any contractual or other right to receive an award in the future. Future grants, if any, will be at the sole discretion of Motorola, including, but not limited to, the timing of any grant, the amount of the award, vesting provisions, and the exercise price.

## Agreement Following Termination of Employment

As a further condition of accepting the Options, you acknowledge and agree that for a period of two years following your termination of employment or service, you will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of those activities, any employee of Motorola or a Subsidiary to terminate his/her employment with Motorola or a Subsidiary and/or to seek employment with your new or prospective employer, or any other company.

You agree that upon termination of employment with Motorola or a Subsidiary, you will immediately inform Motorola of (i) the identity of your new employer (or the nature of any start-up business or self-employment), (ii) your new title, and (iii) your job duties and responsibilities. You hereby authorize

(End of page 3 of the Award Document)

R3 Award Document           (          (        Page 5 of 8

Motorola or a Subsidiary to provide a copy of this Award Document to your new employer. You further agree to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine your compliance with the terms hereof.

### Substitute Stock Appreciation Right

Motorola reserves the right to substitute a Stock Appreciation Right for your Option in the event certain changes are made in the accounting treatment of stock options. Any substitute Stock Appreciation Right shall be applicable to the same number of shares as your Option and shall have the same Date of Expiration, Exercise Price, and other terms and conditions. Any substitute Stock Appreciation Right may be settled only in Common Stock.

### Acceptance of Terms and Conditions

By accepting the Options, you agree to be bound by these terms and conditions, the Plan and any and all rules and regulations established by Motorola in connection with awards issued under the Plan.

### Other Information about Your Options and the Plan

You can find other information about options and the Plan on the Motorola website http://myhr.mot.com/finances/stock_options/index.jsp If you do not have access to the website, please contact Motorola Global Rewards, 1303 E. Algonquin Road, Schaumburg, IL 60196 USA; GBLRW01@Motorola.com; 847-576-7885; for an order form to request Plan documents.

---

*Motorola Confidential Proprietary*           (End of page 4 of the Award Document)

R3 Award Document                                                                    Page 6 of 8

☒ Motorola, Inc.

Printed: March 12, 2008

# STOCK OPTION CONSIDERATION AGREEMENT

**Grant Date: May 06, 2003**

The following Agreement is established to protect the trade secrets, intellectual property, confidential information, customer relationships and goodwill of Motorola, Inc. and each of its subsidiaries (the "Company") both as defined in the Motorola Omnibus Incentive Plan of 2000, as amended (the "2000 Plan").

As sole consideration for the stock option(s) granted to me on the date shown above under the terms of the 2000 Plan, the Amended and Restated Motorola Incentive Plan of 1998 (the "1998 Plan"), the Motorola Compensation/Acquisition Plan of 2000 (the "C/A Plan"), the Motorola Omnibus Incentive Plan of 2002 (the "2002 Plan") or the Motorola Omnibus Incentive Plan of 2003 (the "2003 Plan"), as the case may be ("the Covered Options"), and as a person with a salary grade of EXB and/or as a Motorola appointed vice president or elected officer, I agree to the following:

(1)  I agree that during the course of my employment and thereafter, I will not use or disclose, except on behalf of the Company and pursuant to its directions during the course of my employment, any Company Confidential Information. Confidential Information means information concerning the Company and its business that is not generally known outside the Company. Confidential Information includes: (i) trade secrets; (ii) intellectual property; (iii) the Company's methods of operation and Company processes; (iv) information regarding the Company's present and/or future products, developments, processes and systems, including invention disclosures and patent applications; (v) information on customers or potential customers, including customer's names, sales records, prices, and other terms of sales and Company cost information; (vi) Company personnel data; (vii) Company business plans, marketing plans, financial data and projections; and (viii) information received in confidence by the Company from third parties. Information regarding products or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company or one of its affiliates is considering for broader use, shall not be deemed generally known until such broader use is actually commercially implemented.

(2)  I acknowledge and agree that for a period of two years following my termination of employment, I will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of those activities, any employee of the Company to terminate his/her employment with the Company and/or to seek employment with my new or prospective employer, or any other company.

(3)  I understand that by accepting the Covered Options, (i) if I violate the terms of paragraphs 1 or 2 of this Agreement, or (ii) if during a period of two years following the termination of my employment for any reason I engage in activities which are the same as or similar to activities in which I engaged at any time during the two years preceding termination of my employment, for any person, company or entity in connection with products, services or technological developments (existing or planned) that are the same as, similar to, or competitive with, any products, services or technological developments (existing or planned) on which I worked at any time during the two years preceding the termination of my employment, then:

(a)  all of my vested and unvested Covered Options will terminate and no longer be exercisable; and

(b)  for all Covered Options exercised within two years prior to the termination of my employment or anytime after termination of my employment, I will immediately pay to the Company the difference between the option price and the market price of the Company's common stock on the date of exercise (the "spread").

Paragraph 3(ii) applies in the countries in or for which I have performed work at any time during the two years preceding termination of my employment.

(4)  The requirements of this agreement can be waived or modified only upon the prior written consent of Motorola, Inc. I acknowledge that the promises in this Agreement, not any employment of or services performed by me in the course and scope of that employment, are the sole consideration for the Covered Options.

(5)  I agree that upon termination of employment with the Company and for a period of two years thereafter, I will immediately inform the Company of (i) the identity of my new employer (or the nature of any start-up business, consulting arrangements or self-employment), (ii) my new title, and (iii) my job duties and responsibilities. I hereby authorize the Company to provide a copy of this Agreement to my new employer. I further agree to provide information to the Company as may from time to time be requested in order to determine my compliance with the terms of this Agreement.

(6)  I acknowledge that the harm caused to the Company by the breach or anticipated breach of paragraphs 1 and/or 2 of this Agreement may be irreparable and I agree the Company may have injunctive relief against me in addition to and cumulative with any other rights and remedies the Company may have pursuant to this Agreement, any other agreements between me and the Company for the protection of the Company's Confidential Information, or law, including the recovery of liquidated damages. I agree that any interim or final equitable relief entered by a court of competent jurisdiction will, at the request of the Company, be entered on consent and enforced by any court having jurisdiction over me. This relief would occur without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

(7)  If any provisions contained in this Agreement shall be determined by a court of competent jurisdiction to be overly

broad as to scope of activity, duration or territory, I consent to any request by the Company to such court to interpret such provision by limiting or reducing it to be enforceable to the extent compatible with then applicable law. If any one or more of the terms, provisions, covenants or restrictions of this Agreement are determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. However, and without regard to the foregoing, if paragraphs 1, 2 and 3 herein, or either of them, is not enforceable or otherwise invalid, the consideration I am providing Motorola for the Covered Options would fail. I agree that all of my Covered Options will terminate and that, I will pay Motorola the spread on any Covered Options exercised within two years prior to the termination of my employment or anytime after termination of my employment.

(8)    I accept the terms of this Agreement and the above option(s) to purchase shares of the Common Stock of the Company, subject to the terms of this Agreement, the 1998 Plan, the 2000 Plan, the C/A Plan, the 2002 Plan and/or the 2003 Plan, as the case may be, and any Award Document issued pursuant to one of those Plans. I am familiar with the 1998 Plan, the 2000 Plan, the C/A Plan, the 2002 Plan and the 2003 Plan and agree to be bound by each to the extent applicable, the actions of the Compensation Committee and the actions of the Company's Board of Directors.

(9)    I agree that this Agreement and the 1998 Plan, the 2000 Plan, the C/A Plan, the 2002 Plan and/or the 2003 Plan, as the case may be, and any Award Document issued pursuant to one of those Plans, together constitute an agreement between the Company and me. I further agree that this Agreement is governed by the laws of Illinois, without giving effect to principles of Conflicts of Laws, and any legal action related to this Agreement shall be brought in any federal or state court located in Illinois, USA.

I accept the jurisdiction of these courts and consent to service of process from said courts solely for legal actions related to this Agreement and stock option(s) offer.

(End of the Consideration Agreement)

R3 Award Document

A paper copy of this document, with the recipients signature of acceptance, is maintained by Global Rewards.

FILED: AUGUST 8, 2008
08CV4512
JUDGE ZAGEL
MAGISTRATE JUDGE KEYS

JFB

# EXHIBIT 3

R3 Award Document          (                          (                          Page 1 of 8

## How to use this document

The first thing you will see on this website is your Option Award Document. This shows the date you were notified at the top of the first page and describes most of the terms under which the options are granted. It is important to read the Award Document carefully, though it is not necessary that you sign it.

From the Award Document you will scroll down to the Stock Option Consideration Agreement ("SOCA"). Please read the SOCA carefully to help you decide whether you wish to accept its terms to receive the Option Award. After reviewing the SOCA, you are required to "sign" the SOCA as a condition of the grant. In other words, the options will not become yours unless you sign the SOCA within 30 days of the date of your email notification for this option grant.

At the bottom of the SOCA, there is a place for you to indicate that you either "Accept" or "Reject" its terms. "Signing" and agreeing to be bound by the terms of the SOCA will be done by you when you write "Accept" in the appropriate box and confirm your choice by clicking the "Accept" button. If you write and click that you "Accept," all the terms of the SOCA will apply and the SOCA will be a binding contract between you and Motorola. If you "Reject," the options will revert back to Motorola and will NOT become yours. You will forfeit them permanently. If you exit this site without having marked either the "Accept" or "Reject" button, nothing will happen for the first 30 days following the date of your email notification for this option grant. But if you have still not taken action within 30 days of the date of your email notification, your inaction will be treated as a "Reject" and on the 31st day after the date of your email notification you will forfeit the options permanently.

If you "Accept" the SOCA and thus receive the options, you will be able to view both the Award Document and the signed SOCA on the website in the future. Even so, we strongly recommend that that you print out a hard copy of the Award Document and the accepted SOCA for your records. If you "Reject" the SOCA or do nothing and thus forfeit the options, on the 31st day of the date of your email notification you will lose the ability to access any information on the website regarding these options. To print the Award Document, right click now. Select "Print" from the list. Select the desired printer and click "Print." (NOTE: YOU WILL NOT HAVE ACCESS TO THIS INTERNAL WEB SITE ONCE YOU LEAVE MOTOROLA.)

R3 Award Document

# MOTOROLA, INC.
## AWARD DOCUMENT
### For the
### Motorola Omnibus Incentive Plan of 2003
### Terms and Conditions Related to Employee Nonqualified Stock Options
### Award ID: 516373

| Name : | Michael Fenger | Expiration Date : | May 04, 2014 |
|---|---|---|---|
| Commerce ID : | 12028663 | Number of Options : | 150,000 |
| Grant Date : | May 04, 2004 | Exercise Price : | $ 18.22 (USD) |

Motorola, Inc. ("Motorola") is pleased to grant you options to purchase shares of Motorola's common stock under the Motorola Omnibus Incentive Plan of 2003 (the "Plan"). The number of options ("Options") awarded to you and the Exercise Price per Option, which is the Fair Market Value on the Date of Grant, are stated above. Each Option entitles you to purchase one share of Motorola's common stock on the terms described below and in the Plan.

## Vesting Schedule

| Percentage | Date |
|---|---|
| 25.00 | May 04, 2005 |
| 25.00 | May 04, 2006 |
| 25.00 | May 04, 2007 |
| 25.00 | May 04, 2008 |

### Vesting and Exercisability

You cannot exercise the Options until they have vested.

*Regular Vesting* The Options will vest in accordance with the aforementioned schedule (subject to the other terms hereof).

*Special Vesting* You may be subject to the Special Vesting Dates described below if your employment or service with Motorola or a Subsidiary (as defined below) terminates.

*Exercisability* You may exercise Options at any time after they vest and before they expire as described below.

### Expiration

All Options expire on the earlier of (1) the Date of Expiration as stated above or (2) any of the Special Expiration Dates described below. Once an Option expires, you no longer have the right to exercise it.

### Special Vesting Dates and Special Expiration Dates

There are events that cause your Options to vest sooner than the schedule discussed above or to expire sooner than the Date of Expiration as stated above. Those events are as follows:

*Retirement* If your employment or service with Motorola or a Subsidiary is ended because of your Retirement, Options that were granted at least one year prior to your Retirement that are not vested will automatically become fully vested upon your Retirement. Any remaining unvested Options will be forfeited. All your vested Options will then expire on the earlier of the third anniversary of ending your employment or service because of your Retirement or the Date of Expiration stated above. Retirement means (only for purposes of this Option) your retirement from Motorola or a Subsidiary as follows:

*(i)* Retiring at or after age 55 with 20 years of service;

*(ii)* Retiring at or after age 60 with 10 years of service;

*(iii)* Retiring at or after age 65, without regard to years of service.

*Disability* If your employment or service with Motorola or a Subsidiary is terminated because of your Total and Permanent Disability (as defined below), Options that are not vested will automatically become fully vested upon your termination of employment or service. All your Options will then expire on the earlier of the third anniversary of your

Motorola Confidential Proprietary

(End of page 1 of the Award Document)

termination of employment or service because of your Total and Permanent Disability or the Date of Expiration stated above. Until that time, the Options will be exercisable by you or your guardian or legal representative.

*Death* If your employment or service with Motorola or a Subsidiary is terminated because of your death, Options that are not vested will automatically become fully vested upon your death. All your Options will then expire on the earlier of the third anniversary of your death or the Date of Expiration stated above. Until that time, with written proof of death and inheritance, the Options will be exercisable by your legal representative, legatees or distributees.

*Change In Control* If there is a Change In Control of Motorola (as defined in the Plan), all the unvested Options will automatically become fully vested as described in the Plan. If Motorola or a Subsidiary terminates your employment or service other than for Serious Misconduct within two years of consummation of a Change In Control, all of your vested Options will be exercisable until the Date of Expiration stated above.

*Termination of Employment or Service Because of Serious Misconduct* If Motorola or a Subsidiary terminates your employment or service because of Serious Misconduct (as defined below) all of your Options (vested and unvested) expire upon your termination.

*Change in Employment in Connection with a Divestiture* If you accept employment with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfer of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary (a "Divestiture"), all of your unvested Options will automatically expire upon termination in direct connection with a Divestiture and your vested Options will expire 12 months after such Divestiture or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service by Motorola or a Subsidiary Other than for Serious Misconduct or a Divestiture* If Motorola or a Subsidiary on its initiative, terminates your employment or service other than for Serious Misconduct or a Divestiture, all of your unvested Options will automatically expire upon termination and your vested Options will expire twelve months after your termination of employment or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service for any Other Reason than Described Above* If your employment or service with Motorola or a Subsidiary terminates for any reason other than that described above, including voluntary resignation of your employment or service, all of your Options (vested and unvested) will automatically expire on the date of termination.

## Leave of Absence/Temporary Layoff

If you take a Leave of Absence from Motorola or a Subsidiary that your employer has approved in writing in accordance with your employer's Leave of Absence Policy and which does not constitute a termination of employment as determined by Motorola, or you are placed on Temporary Layoff (as defined below) by Motorola or a Subsidiary the following will apply:

*Vesting of Options* Options will continue to vest in accordance with the vesting schedule set forth above.

*Exercising Options* You may exercise Options that are vested or that vest during the leave of absence or layoff.

*Effect of Termination of Employment or Service* If your employment or service is terminated during the Leave of Absence or Temporary Layoff, the treatment of your Options will be determined as described under "Special Vesting Dates and Special Expiration Dates" above.

## Other Terms

Method of Exercising You must follow the procedures for exercising options established by Motorola from time to time. At the time of exercise, you must pay the Exercise Price for all of the Options being exercised and any taxes that are required to be withheld by Motorola or a Subsidiary in connection with the exercise. Options may not be exercised for less than 50 shares unless the number of shares represented by the Option is less than 50 shares, in which case the Option must be exercised for the remaining amount.

Transferability Unless the Committee provides, Options are not transferable other than by will or the laws of descent and distribution.

Tax Withholding Motorola or a Subsidiary is entitled to withhold an amount equal to the required minimum statutory withholding taxes for the respective tax jurisdictions attributable to any share of common stock deliverable in connection with the exercise of the Options. You may satisfy any withholding obligation in whole or in part by electing to have Motorola retain Option shares having a Fair

R3 Award Document

Market Value on the date of exercise equal to the minimum amount required to be withheld.

### Definition of Terms

If a term is used but not defined, it has the meaning given such term in the Plan.

"Fair Market Value" is the closing price for a share of Motorola common stock on the last trading day before the date of grant or date of exercise, whichever is applicable. The official source for the closing price is the New York Stock Exchange Composite Transaction as reported in the Wall Street Journal, Midwest edition.

"Serious Misconduct" means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

"Subsidiary" means an entity of which Motorola owns directly or indirectly at least 50% and that Motorola consolidates for financial reporting purposes.

"Total and Permanent Disability" means for (x) U.S. employees, entitlement to long-term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan or a determination of a permanent and total disability under a state workers compensation statute and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations.

"Temporary Layoff" means a layoff or redundancy that is communicated as being for a period of up to twelve months and as including a right to recall under defined circumstances.

### Consent to Transfer Personal Data

By accepting this award, you voluntarily acknowledge and consent to the collection, use, processing and transfer of personal data as described in this paragraph. You are not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect your ability to participate in the Plan. Motorola, its Subsidiaries and your employer hold certain personal information about you, that may include your name, home address and telephone number, date of birth, social security number or other employee identification number, salary, nationality, job title, any shares of stock held in Motorola, or details of all options or any other entitlement to shares of stock awarded, canceled, purchased, vested, or unvested, for the purpose of managing and administering the Plan ("Data"). Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of

your participation in the Plan, and Motorola and/or its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, including the United States. You authorize them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on your behalf to a broker or other third party with whom you may elect to deposit any shares of stock acquired pursuant to the Plan. You may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing your consent may affect your ability to participate in the Plan.

### Acknowledgement of Discretionary Nature of the Plan; No Vested Rights

You acknowledge and agree that the Plan is discretionary in nature and limited in duration, and may be amended, cancelled, or terminated by Motorola or a Subsidiary, in its sole discretion, at any time. The grant of awards under the Plan is a one-time benefit and does not create any contractual or other right to receive an award in the future. Future grants, if any, will be at the sole discretion of Motorola, including, but not limited to, the timing of any grant, the amount of the award, vesting provisions, and the exercise price.

### Agreement Following Termination of Employment

As a further condition of accepting the Options, you acknowledge and agree that for a period of two years following your termination of employment or service, you will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of those activities, any employee of Motorola or a Subsidiary to terminate his/her employment with Motorola or a Subsidiary and/or to seek employment with your new or prospective employer, or any other company.

You agree that upon termination of employment with Motorola or a Subsidiary, you will immediately inform Motorola of (i) the identity of your new employer (or the nature of any start-up business or self-employment), (ii) your new title, and (iii) your job duties and responsibilities. You hereby authorize Motorola or a Subsidiary to provide a copy of this Award Document to your new employer. You further

R3 Award Document

Page 5 of 8

agree to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine your compliance with the terms hereof.

### Substitute Stock Appreciation Right

Motorola reserves the right to substitute a Stock Appreciation Right for your Option in the event certain changes are made in the accounting treatment of stock options. Any substitute Stock Appreciation Right shall be applicable to the same number of shares as your Option and shall have the same Date of Expiration, Exercise Price, and other terms and conditions. Any substitute Stock Appreciation Right may be settled only in Common Stock.

### Acceptance of Terms and Conditions

By accepting the Options, you agree to be bound by these terms and conditions, the Plan and any and all rules and regulations established by Motorola in connection with awards issued under the Plan.

### Other Information about Your Options and the Plan

You can find other information about options and the Plan on the Motorola website http://myhr.mot.com/finances/stock_options/index.jsp If you do not have access to the website, please contact Motorola Global Rewards, 1303 E. Algonquin Road, Schaumburg, IL 60196 USA; GBLRW01@Motorola.com; 847-576-7885; for an order form to request Plan documents.

Motorola Confidential Proprietary

(End of page 4 of the Award Document)

R3 Award Document ( Page 6 of 8

☒ Motorola, Inc.

**Printed: March 12, 2008**

# STOCK OPTION CONSIDERATION AGREEMENT

**Grant Date: May 04, 2004**

The following Agreement is established to protect the trade secrets, intellectual property, confidential information, customer relationships and goodwill of Motorola, Inc. and each of its subsidiaries (the "Company") both as defined in the Motorola Omnibus Incentive Plan of 2000, as amended (the "2000 Plan").

As sole consideration for the stock option(s) granted to me on the date shown above under the terms of the 2000 Plan, the Amended and Restated Motorola Incentive Plan of 1998 (the "1998 Plan"), the Motorola Compensation/Acquisition Plan of 2000 (the "C/A Plan"), the Motorola Omnibus Incentive Plan of 2002 (the "2002 Plan") or the Motorola Omnibus Incentive Plan of 2003 (the "2003 Plan"), as the case may be ("the Covered Options"), and as a person with a salary grade of EXB and/or as a Motorola appointed vice president or elected officer, I agree to the following:

(1) I agree that during the course of my employment and thereafter, I will not use or disclose, except on behalf of the Company and pursuant to its directions during the course of my employment, any Company Confidential Information. Confidential Information means information concerning the Company and its business that is not generally known outside the Company. Confidential Information includes: (i) trade secrets; (ii) intellectual property; (iii) the Company's methods of operation and Company processes; (iv) information regarding the Company's present and/or future products, developments, processes and systems, including invention disclosures and patent applications; (v) information on customers or potential customers, including customer's names, sales records, prices, and other terms of sales and Company cost information; (vi) Company personnel data; (vii) Company business plans, marketing plans, financial data and projections; and (viii) information received in confidence by the Company from third parties. Information regarding products or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company or one of its affiliates is considering for broader use, shall not be deemed generally known until such broader use is actually commercially implemented.

(2) I acknowledge and agree that for a period of two years following my termination of employment, I will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of those activities, any employee of the Company to terminate his/her employment with the Company and/or to seek employment with my new or prospective employer, or any other company.

(3) I understand that by accepting the Covered Options, (i) if I violate the terms of paragraphs 1 or 2 of this Agreement, or (ii) if during a period of two years following the termination of my employment for any reason I engage in activities which are the same as or similar to activities in which I engaged at any time during the two years preceding termination of my employment, for any person, company or entity in connection with products, services or technological developments (existing or planned) that are the same as, similar to, or competitive with, any products, services or technological developments (existing or planned) on which I worked at any time during the two years preceding the termination of my employment, then:

   (a) all of my vested and unvested Covered Options will terminate and no longer be exercisable; and

   (b) for all Covered Options exercised within two years prior to the termination of my employment or anytime after termination of my employment, I will immediately pay to the Company the difference between the option price and the market price of the Company's common stock on the date of exercise (the "spread").

Paragraph 3(ii) applies in the countries in or for which I have performed work at any time during the two years preceding termination of my employment.

(4) The requirements of this agreement can be waived or modified only upon the prior written consent of Motorola, Inc. I acknowledge that the promises in this Agreement, not any employment of or services performed by me in the course and scope of that employment, are the sole consideration for the Covered Options.

(5) I agree that upon termination of employment with the Company and for a period of two years thereafter, I will immediately inform the Company of (i) the identity of my new employer (or the nature of any start-up business, consulting arrangements or self-employment), (ii) my new title, and (iii) my job duties and responsibilities. I hereby authorize the Company to provide a copy of this Agreement to my new employer. I further agree to provide information to the Company as may from time to time be requested in order to determine my compliance with the terms of this Agreement.

(6) I acknowledge that the harm caused to the Company by the breach or anticipated breach of paragraphs 1 and/or 2 of this Agreement may be irreparable and I agree the Company may seek injunctive relief against me in addition to and cumulative with any other rights and remedies the Company may have pursuant to this Agreement, any other agreements between me and the Company for the protection of the Company's Confidential Information, or law, including the recovery of liquidated damages. I agree that any interim or final equitable relief entered by a court of competent jurisdiction will, at the request of the Company, be entered on consent and enforced by any court having jurisdiction over me. This relief would occur without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

(7) If any provisions contained in this Agreement shall be determined by a court of competent jurisdiction to be overly

broad as to scope of activity, duration or territory, I consent to any request by the Company to such court to interpret such provision by limiting or reducing it to be enforceable to the extent compatible with then applicable law. If any one or more of the terms, provisions, covenants or restrictions of this Agreement are determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. However, and without regard to the foregoing, if paragraphs 1, 2 and 3 herein, or either of them, is not enforceable or otherwise invalid, the consideration I am providing Motorola for the Covered Options would fail. I agree that all of my Covered Options will terminate and that, I will pay Motorola the spread on any Covered Options exercised within two years prior to the termination of my employment or anytime after termination of my employment.

(8)    I accept the terms of this Agreement and the above option(s) to purchase shares of the Common Stock of the Company, subject to the terms of this Agreement, the 1998 Plan, the 2000 Plan, the C/A Plan, the 2002 Plan and/or the 2003 Plan, as the case may be, and any Award Document issued pursuant to one of those Plans. I am familiar with the 1998 Plan, the 2000 Plan, the C/A Plan, the 2002 Plan and the 2003 Plan and agree to be bound by each to the extent applicable, the actions of the Compensation Committee and the actions of the Company's Board of Directors.

(9)    I agree that this Agreement and the 1998 Plan, the 2000 Plan, the C/A Plan, the 2002 Plan and/or the 2003 Plan, as the case may be, and any Award Document issued pursuant to one of those Plans, together constitute an agreement between the Company and me. I further agree that this Agreement is governed by the laws of Illinois, without giving effect to principles of Conflicts of Laws, and any legal action related to this Agreement shall be brought in any federal or state court located in Illinois, USA.

I accept the jurisdiction of these courts and consent to service of process from said courts solely for legal actions related to this Agreement and stock option(s) offer.

*(End of the Consideration Agreement)*

Case 1:08-cv-04512    Document 1-3    Filed 08/08/2008    Page 9 of 33

**The recipient has accepted the terms of the Agreement on June 21, 2004**

# EXHIBIT 4

**How to use this document**

The first thing you will see on this website is your Option Award Document. This shows the date you were notified at the top of the first page and describes most of the terms under which the options are granted. It is important to read the Award Document carefully, though it is not necessary that you sign it.

From the Award Document you will scroll down to the Stock Option Consideration Agreement ("SOCA"). Please read the SOCA carefully to help you decide whether you wish to accept its terms to receive the Option Award. After reviewing the SOCA, you are required to "sign" the SOCA as a condition of the grant. In other words, the options will not become yours unless you sign the SOCA within 30 days of the date of your email notification for this option grant.

At the bottom of the SOCA, there is a place for you to indicate that you either "Accept" or "Reject" its terms. "Signing" and agreeing to be bound by the terms of the SOCA will be done by you when you write "Accept" in the appropriate box and confirm your choice by clicking the "Accept" button. If you write and click that you "Accept," all the terms of the SOCA will apply and the SOCA will be a binding contract between you and Motorola. If you "Reject," the options will revert back to Motorola and will NOT become it. You will forfeit them permanently. If you exit this site without having marked either the "Accept" or "Reject" button, nothing will happen for the first 30 days following the date of your email notification for this option grant. But if you have still not taken action within 30 days of the date of your email notification, your inaction will be treated as a "Reject" and on the 31st day after the date of your email notification you will forfeit the options permanently.

If you "Accept" the SOCA and thus receive the options, you will be able to view both the Award Document and the signed SOCA on the website in the future. Even so, we strongly recommend that that you print out a hard copy of the Award Document and the accepted SOCA for your records. If you "Reject" the SOCA or do nothing and thus forfeit the options, on the 31st day of the date of your email notification you will lose the ability to access any information on the website regarding these options. To print the Award Document, right click now. Select "Print" from the list. Select the desired printer and click "Print." (NOTE: YOU WILL NOT HAVE ACCESS TO THIS INTERNAL WEB SITE ONCE YOU LEAVE MOTOROLA.)

Motorola Confidential Proprietary

# MOTOROLA, INC.
## AWARD DOCUMENT
### For the
### Motorola Omnibus Incentive Plan of 2003
### Terms and Conditions Related to Employee Nonqualified Stock Options
### Award ID: 519282

| Name : | Michael Fenger | Expiration Date : | May 03, 2015 |
|---|---|---|---|
| Commerce ID : | 12028663 | Number of Options : | 200,000 |
| Grant Date : | May 03, 2005 | Exercise Price : | $ 15.47 (USD) |

Motorola, Inc. ("Motorola") is pleased to grant you options to purchase shares of Motorola's common stock under the Motorola Omnibus Incentive Plan of 2003 (the "Plan"). The number of options ("Options") awarded to you and the Exercise Price per Option, which is the Fair Market Value on the Date of Grant, are stated above. Each Option entitles you to purchase one share of Motorola's common stock on the terms described below and in the Plan.

## Vesting Schedule

| Percentage | Date |
|---|---|
| 25.00 | May 03, 2006 |
| 25.00 | May 03, 2007 |
| 25.00 | May 03, 2008 |
| 25.00 | May 03, 2009 |

### Vesting and Exercisability

You cannot exercise the Options until they have vested.

*Regular Vesting* - The Options will vest in accordance with the aforementioned schedule (subject to the other terms hereof):

*Special Vesting* - You may be subject to the Special Vesting Dates described below if your employment or service with Motorola or a Subsidiary (as defined below) terminates.

*Exercisability*- You may exercise Options at any time after they vest and before they expire as described below.

### Expiration

All Options expire on the earlier of (1) the Date of Expiration as stated above or (2) any of the Special Expiration Dates described below. Once an Option expires, you no longer have the right to exercise it.

### Special Vesting Dates and Special Expiration Dates

There are events that cause your Options to vest sooner than the schedule discussed above or to expire sooner than the Date of Expiration as stated above. Those events are as follows:

*Retirement* - If your employment or service with Motorola or a Subsidiary is ended because of your Retirement, all of your unvested Options will automatically expire upon Retirement. All of your vested Options will then expire on the earlier of (i) the date ninety (90) days after your Retirement or (ii) the Date of Expiration stated above. Retirement means (only for purposes of this Option) your retirement from Motorola or a Subsidiary as follows:

Motorola Confidential Proprietary

R3 Award Document                                    Page 3 of 8

(i) Retiring at or after age 55 with 20 years of service;

(ii) Retiring at or after age 60 with 10 years of service;

(iii) Retiring at or after age 65, without regard to years of service.

*Disability* - If your employment or service with Motorola or a Subsidiary is terminated because of your Total and Permanent Disability (as defined below), Options that are not vested will automatically become fully vested upon your termination of employment or service. All your Options will then expire on the earlier of the first anniversary of your termination of employment or service because of your Total and Permanent Disability or the Date of Expiration stated above. Until that time, the Options will be exercisable by you or your guardian or legal representative.

*Death*- If your employment or service with Motorola or a Subsidiary is terminated because of your death, Options that are not vested will automatically become fully vested upon your death. All your Options will then expire on the earlier of the first anniversary of your death or the Date of Expiration stated above. Until that time, with written proof of death and inheritance, the Options will be exercisable by your legal representative, legatees or distributees.

*Change In Control* - If there is a Change In Control of Motorola (as defined in the Plan), all the unvested Options will automatically become fully vested as described in the Plan. If Motorola or a Subsidiary terminates your employment or service other than for Serious Misconduct within two years of consummation of a Change In Control, all of your vested Options will be exercisable until the Date of Expiration stated above.

*Termination of Employment or Service Because of Serious Misconduct* - If Motorola or a Subsidiary terminates your employment or service because of Serious Misconduct (as defined below) all of your Options (vested and unvested) expire upon your termination.

*Change in Employment in Connection with a Divestiture* - If you accept employment with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfer of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary (a "Divestiture"), all of your unvested Options will automatically expire upon termination in direct connection with a Divestiture and your vested Options will expire 90 days after such Divestiture or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service by Motorola or a Subsidiary Other than for Serious Misconduct or a Divestiture* - If Motorola or a Subsidiary on its initiative, terminates your employment or service other than for Serious Misconduct or a Divestiture, all of your unvested Options will automatically expire upon termination and your vested Options will expire 90 days after your termination of employment or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service for any Other Reason than Described Above* - If your employment or service with Motorola or a Subsidiary terminates for any reason other than that described above, including voluntary resignation of your employment or service, all of your unvested Options will automatically expire upon termination of your employment or service and all of your vested but not yet exercised Options will expire on the earlier of (i) the date ninety (90) days after the date of termination of your employment or service or (ii) the Date of Expiration stated above.

**Leave of Absence/Temporary Layoff**

If you take a Leave of Absence from Motorola or a Subsidiary that your employer has approved in writing in accordance with your employer's Leave of Absence Policy and which does not constitute a termination of employment as determined by Motorola, or you are placed on Temporary Layoff (as defined below) by Motorola or a Subsidiary the following will apply:

*Vesting of Options* - Options will continue to vest in accordance with the vesting schedule set forth above.

*Exercising Options* - You may exercise Options that are vested or that vest during the leave of absence or layoff.

*Effect of Termination of Employment or Service* - If your employment or service is terminated during the Leave of Absence or Temporary Layoff, the treatment of your Options will be determined as described under "Special Vesting Dates and Special Expiration Dates" above.

**Other Terms**

*Method of Exercising* - You must follow the procedures for exercising options established by Motorola from time to time. At the time of exercise, you must pay the Exercise Price for all of the Options being exercised and any taxes that are required to be withheld by Motorola or a Subsidiary in connection with the exercise. Options may not be exercised for less than 50 shares unless the number of shares represented by the Option is less than 50 shares, in which case the Option must be exercised for the remaining amount.

R3 Award Document

Motorola Confidential Proprietary

*Transferability* - Unless the Committee provides, Options are not transferable other than by will or the laws of descent and distribution.

*Tax Withholding* - Motorola or a Subsidiary is entitled to withhold an amount equal to the required minimum statutory withholding taxes for the respective tax jurisdictions attributable to any share of common stock deliverable in connection with the exercise of the Options. You may satisfy any withholding obligation in whole or in part by electing to have Motorola retain Option shares having a Fair Market Value on the date of exercise equal to the minimum amount required to be withheld.

### Definition of Terms

If a term is used but not defined, it has the meaning given such term in the Plan.

"Fair Market Value" is the closing price for a share of Motorola common stock on the last trading day before the date of grant or date of exercise, whichever is applicable. The official source for the closing price is the New York Stock Exchange Composite Transaction as reported in the Wall Street Journal, Midwest edition.

"Serious Misconduct" means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

"Subsidiary" means an entity of which Motorola owns directly or indirectly at least 50% and that Motorola consolidates for financial reporting purposes.

"Total and Permanent Disability" means for (x) U.S. employees, entitlement to long-term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan or a determination of a permanent and total disability under a state workers compensation statute and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations.

"Temporary Layoff" means a layoff or redundancy that is communicated as being for a period of up to twelve months and as including a right to recall under defined circumstances.

### Consent to Transfer Personal Data

By accepting this award, you voluntarily acknowledge and consent to the collection, use, processing and transfer of personal data as described

in this paragraph. You are not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect your ability to participate in the Plan. Motorola, its Subsidiaries and your employer hold certain personal information about you, that may include your name, home address and telephone number, date of birth, social security number or other employee identification number, salary, salary grade, hire date, nationality, job title, any shares of stock held in Motorola, or details of all options or any other entitlement to shares of stock awarded, canceled, purchased, vested, or unvested, for the purpose of managing and administering the Plan ("Data").

Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of your participation in the Plan, and Motorola and/or any of its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, including the United States. You authorize them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on your behalf to a broker or other third party with whom you may elect to deposit any shares of stock acquired pursuant to the Plan. You may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing your consent may affect your ability to participate in the Plan.

### Acknowledgement of Discretionary Nature of the Plan; No Vested Rights

You acknowledge and agree that the Plan is discretionary in nature and limited in duration, and may be amended, cancelled, or terminated by Motorola or a Subsidiary, in its sole discretion, at any time. The grant of awards under the Plan is a one-time benefit and does not create any contractual or other right to receive an award in the future. Future grants, if any, will be at the sole discretion of Motorola, including, but not limited to, the timing of any grant, the amount of the award, vesting provisions, and the exercise price.

Motorola Confidential Proprietary

R3 Award Document

Page 5 of 8

Motorola Confidential Proprietary

## Agreement Following Termination of Employment

As a further condition of accepting the Options, you acknowledge and agree that for a period of two years following your termination of employment or service, you will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of those activities, any employee of Motorola or a Subsidiary to terminate his/her employment with Motorola or a Subsidiary and/or to seek employment with your new or prospective employer, or any other company.

You agree that upon termination of employment with Motorola or a Subsidiary, you will immediately inform Motorola of (i) the identity of your new employer (or the nature of any start-up business or self-employment), (ii) your new title, and (iii) your job duties and responsibilities. You hereby authorize Motorola or a Subsidiary to provide a copy of this Award Document to your new employer. You further agree to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine your compliance with the terms hereof.

## Substitute Stock Appreciation Right

Motorola reserves the right to substitute a Stock Appreciation Right for your Option in the event certain changes are made in the accounting treatment of stock options. Any substitute Stock Appreciation Right shall be applicable to the same number of shares as your Option and shall have the same Date of Expiration, Exercise Price, and other terms and conditions. Any substitute Stock Appreciation Right may be settled only in Common Stock.

## Acceptance of Terms and Conditions

By accepting the Options, you agree to be bound by these terms and conditions, the Plan and any and all rules and regulations established by Motorola in connection with awards issued under the Plan.

## Other Information about Your Options and the Plan

You can find other information about options and the Plan on the Motorola website http://myhr.mot.com/finances/stock_options/index.jsp If you do not have access to the website, please contact Motorola Global Rewards, 1303 E. Algonquin Road, Schaumburg, IL 60196 USA; GBLRW01@Motorola.com; 847-576-7885; for an order form to request Plan documents.

Motorola Confidential Proprietary

R3 Award Document                                                        Page 6 of 8

☒ Motorola, Inc.

**Printed: March 12, 2008**

## STOCK OPTION CONSIDERATION AGREEMENT

**Grant Date: May 03, 2005**

The following Agreement is established to protect the trade secrets, intellectual property, confidential information, customer relationships and goodwill of Motorola, Inc. and each of its subsidiaries (the "Company") both as defined in the Motorola Omnibus Incentive Plan of 2000, as amended (the "2000 Plan").

As sole consideration for the stock option(s) granted to me on the date shown above under the terms of the 2000 Plan, the Amended and Restated Motorola Incentive Plan of 1998 (the "1998 Plan"), the Motorola Compensation/Acquisition Plan of 2000 (the "C/A Plan"), the Motorola Omnibus Incentive Plan of 2002 (the "2002 Plan") or the Motorola Omnibus Incentive Plan of 2003 (the "2003 Plan"), as the case may be ("the Covered Options"), and as a person with a salary grade of EXB and/or as a Motorola appointed vice president or elected officer, I agree to the following:

1.  I agree that during the course of my employment and thereafter, I will not use or disclose, except on behalf of the Company and pursuant to its directions during the course of my employment, any Company Confidential Information. Confidential Information means information concerning the Company and its business that is not generally known outside the Company. Confidential Information includes: (i) trade secrets; (ii) intellectual property; (iii) the Company's methods of operation and Company processes; (iv) information regarding the Company's present and/or future products, developments, processes and systems, including invention disclosures and patent applications; (v) information on customers or potential customers, including customer's names, sales records, prices, and other terms of sales and Company cost information; (vi) Company personnel data; (vii) Company business plans, marketing plans, financial data and projections; and (viii) information received in confidence by the Company from third parties. Information regarding products or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company or one of its affiliates is considering for broader use, shall not be deemed generally known until such broader use is actually commercially implemented.

2.  I acknowledge and agree that for a period of two years following my termination of employment, I will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of those activities, any employee of the Company to terminate his/her employment with the Company and/or to seek employment with my new or prospective employer, or any other company.

3.  I understand that by accepting the Covered Options, (i) if I violate the terms of paragraphs 1 or 2 of this Agreement, or (ii) if during a period of two years following the termination of my employment for any reason I engage in activities which are the same as or similar to activities in which I engaged at any time during the two years preceding termination of my employment, for any person, company or entity in connection with products, services or technological developments (existing or planned) that are the same as, similar to, or competitive with, any products, services or technological developments (existing or planned) on which I worked at any time during the two years preceding the termination of my employment, then:

    a.  all of my vested and unvested Covered Options will terminate and no longer be exercisable; and

    b.  for all Covered Options exercised within two years prior to the termination of my employment or anytime after termination of my employment, I will immediately pay to the Company the difference between the option price and the market price of the Company's common stock on the date of exercise (the "spread").

Paragraph 3(ii) applies in the countries in or for which I have performed work at any time during the two years preceding termination of my employment.

4.  The requirements of this agreement can be waived or modified only upon the prior written consent of Motorola, Inc. I acknowledge that the promises in this Agreement, not any employment of or services performed by me in the course and scope of that employment, are the sole consideration for the Covered Options.

5.  I agree that upon termination of employment with the Company and for a period of two years thereafter, I will immediately inform the Company of (i) the identity of my new employer (or the nature of any start-up business, consulting arrangements or self-employment), (ii) my new title, and (iii) my job duties and responsibilities. I hereby authorize the Company to provide a copy of this Agreement to my new employer. I further agree to provide information to the Company as may from time to time be requested in order to determine my compliance with the terms of this Agreement.

6.  I acknowledge that the harm caused to the Company by the breach or anticipated breach of paragraphs 1 and/or 2

of this Agreement may be irreparable and I agree the Company may have injunctive relief against me in addition to and cumulative with any other rights and remedies the Company may have pursuant to this Agreement, any other agreements between me and the Company for the protection of the Company's Confidential Information, or law, including the recovery of liquidated damages. I agree that any interim or final equitable relief entered by a court of competent jurisdiction will, at the request of the Company, be entered on consent and enforced by any court having jurisdiction over me. This relief would occur without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

7.    If any provisions contained in this Agreement shall be determined by a court of competent jurisdiction to be overly broad as to scope of activity, duration or territory, I consent to any request by the Company to such court to interpret such provision by limiting or reducing it to be enforceable to the extent compatible with then applicable law. If any one or more of the terms, provisions, covenants or restrictions of this Agreement are determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. However, and without regard to the foregoing, if paragraphs 1, 2 and 3 herein, or either of them, is not enforceable or otherwise invalid, the consideration I am providing Motorola for the Covered Options would fail. I agree that all of my Covered Options will terminate and that, I will pay Motorola the spread on any Covered Options exercised within two years prior to the termination of my employment or anytime after termination of my employment.

8.    I accept the terms of this Agreement and the above option(s) to purchase shares of the Common Stock of the Company, subject to the terms of this Agreement, the 1998 Plan, the 2000 Plan, the C/A Plan, the 2002 Plan and/or the 2003 Plan, as the case may be, and any Award Document issued pursuant to one of those Plans. I am familiar with the 1998 Plan, the 2000 Plan, the C/A Plan, the 2002 Plan and the 2003 Plan and agree to be bound by each to the extent applicable, the actions of the Compensation Committee and the actions of the Company's Board of Directors.

9.    I agree that this Agreement and the 1998 Plan, the 2000 Plan, the C/A Plan, the 2002 Plan and/or the 2003 Plan, as the case may be, and any Award Document issued pursuant to one of those Plans, together constitute an agreement between the Company and me. I further agree that this Agreement is governed by the laws of Illinois, without giving effect to principles of Conflicts of Laws, and any legal action related to this Agreement shall be brought in any federal or state court located in Illinois, USA.

I accept the jurisdiction of these courts and consent to service of process from said courts solely for legal actions related to this Agreement and stock option(s) offer.

*(End of the Consideration Agreement)*

R3 Award Document

**The recipient has accepted the terms of the Agreement on June 21, 2005**

# EXHIBIT 5

R3 Award Document

**How to use this document**

The first thing you will see on this website is your Restricted Stock Unit ("RSU") Award Document ("Award Document"). This shows the grant date at the top of the first page and describes the terms of the Award. After reviewing the Award Document, you are required to "electronically sign" the Award Document as a condition of the grant.

In other words, the RSUs will not become yours unless you sign the Award Agreement within 30 days of the date of your email notification for this RSU grant.

At the bottom of the Award Document, there is a place for you to indicate that you either "Accept" or "Reject" its terms. "Signing" and agreeing to be bound by the terms of the Award Document will be done by you when you write "Accept" in the appropriate box and confirm your choice by clicking the "Accept" button. If you write and click that you "Accept," the RSUs will become yours. By accepting, all the terms of the Award Document will apply and the Award Document will be a binding contract between you and Motorola. If you "Reject," the RSUs will revert back to Motorola and will NOT become yours. You will forfeit them permanently. If you exit this site without having marked either the "Accept" or "Reject" button, nothing will happen for the first 30 days following the date of your email notification for this RSU grant. But if you have still not taken action within 30 days of the date of your email notification, your inaction will be treated as a "Reject" and on the 31st day after the date of your email notification you will forfeit the RSUs permanently.

If you "Accept" the Award Document and thus receive the RSUs, you will be able to view the Award Document on the website in the future. Even so, we strongly recommend that you print out a hard copy of the Award Document for your records. If you "Reject" the Award Document or do nothing and thus forfeit the RSUs, on the 31st day after the date of your email notification you will lose the ability to access the information on the website regrding these RSUs. To print the Award Document, right click now. Select "Print" from the list. Select the desired printer and click "Print." (NOTE: YOU WILL NOT HAVE ACCESS TO THIS INTERNAL WEB SITE ONCE YOU LEAVE MOTOROLA.)

Motorola Confidential Proprietary                                                  (Beginning of the Award Document)

# RESTRICTED STOCK
# UNIT AWARD AGREEMENT

This Restricted Stock Units Award (the "Award") is made this May 03, 2005 ("Date of Grant"), by Motorola, Inc. (the "Company" or "Motorola") to Michael Fenger (the "Grantee").

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the Company hereby awards restricted stock units to Grantee on the following terms and conditions:

1.   **Award of Restricted Stock Units** The Company hereby awards to Grantee a total of Twenty-Five Thousand (25,000) Motorola restricted stock Units (the " Units") subject to the terms and conditions set forth below.

2.   **Restrictions.**
     The Units are being awarded to Grantee subject to the transfer and forfeiture conditions set forth below (the "Restrictions") which shall lapse, if at all, as described in Section 3 below. For purposes of this Award, the term Units includes any additional Units granted to the Grantee with respect to Units, still subject to the Restrictions.

     a.   Grantee may not directly or indirectly, by operation of law or otherwise, voluntarily or involuntarily, sell, assign, pledge, encumber, charge or otherwise transfer any of the Units still subject to Restrictions. The Units shall be forfeited if Grantee violates or attempts to violate these transfer restrictions.

     b.   Any Units still subject to the Restrictions shall be automatically forfeited upon the Grantee's termination of employment with Motorola or a Motorola Subsidiary for any reason, other than death or Total and Permanent Disability, as defined in Section 3(a) below. For purposes of this Agreement, a "Motorola Subsidiary" is any corporation or other entity in which a 50 percent or greater interest is held directly or indirectly by Motorola and which is consolidated for financial reporting purposes.

     c.   If Grantee engages, directly or indirectly, in any activity which is in competition with any activity of Motorola or any Motorola Subsidiary, or in any action or conduct which is in any manner adverse or in any way contrary to the interests of Motorola or any Motorola Subsidiary, all Units shall be forfeited. This determination shall be made by the Committee and Leadership Committee of the Company's Board of Directors (the "Committee").

     The Company will not be obligated to pay Grantee any consideration whatsoever for forfeited Units.

3.   **Lapse of Restrictions.**

     a.   The Restrictions applicable to the Units shall lapse, as long as the Units have not been forfeited as described in Section 2 above, as follows:

          i.    50% on November 03, 2007

          ii.   50% on May 03, 2010

          iii.  Upon a Change in Control of the Company (as defined by the 2002 Omnibus Plan);

          iv.   If the Grantee becomes Totally and Permanently Disabled. A "Total and Permanent Disability" means for (x) U.S. employees, entitlement to long term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan or a determination of a permanent and total disability under a state workers compensation statute and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations; or

          v.    If the Grantee dies.

     b.   If during the Restricted Period the Grantee takes a Leave of Absence from Motorola or a Motorola Subsidiary and the Grantee's employment from Motorola or a Motorola Subsidiary is not terminated for any reason (other than death or Total and Permanent Disability), the Units will continue to be subject to this Agreement. If the Restricted Period expires while the Grantee is on a Leave of Absence the Grantee will be entitled to the Units even if the Grantee has not returned to active employment. "Leave of Absence" means a leave of absence from Motorola or a Motorola Subsidiary that is not a termination of employment, as determined by Motorola.

     c.   To the extent the Restrictions lapse under this Section 3 with respect to the Units, they will be free of the terms and conditions of this Award.

4.   **Adjustments**
     If the number of outstanding shares of Common Stock of the Company is changed as a result of stock dividend, stock split or the like without additional consideration to the Company, the number of Units subject to this Award

shall be adjusted to correspond to the change in the outstanding shares of Motorola Common Stock ("Common Stock").

5. **Dividend Equivalents**

Upon the Company's payment of a cash dividend with respect to its Common Stock, the number of Units shall be increased by dividing the amount of dividend the Grantee would have received had the Grantee owned a number of shares of Common Stock equal to the number of Units then credited to his or her account by the closing price of the Company's Common Stock on the last trading day before the date of the dividend payment, as reported for the New York Stock Exchange - Composite Transaction in the Wall Street Journal, Midwest edition. If a dividend is paid in shares of stock of another company or in other property, the Grantee will be credited with the number of shares of that company or the amount of property which would have been received had the Grantee owned a number of shares of Common Stock equal to the number of Units credited to his or her account. The shares or property so credited will be subject to the same Restrictions and other terms and conditions applicable to Units and will be paid out in kind at the time the Restrictions lapse.

6. **Delivery of Certificates or Equivalent**

Upon the lapse of Restrictions applicable to the Units, the Company shall, at its election, either deliver to the Grantee (i) a certificate representing a number of shares of Common Stock equal to the number of Units upon which such Restrictions have lapsed, plus, a cash payment equal to the value of any fractional unit then credited to the Grantee or (ii) establish a brokerage account for the Grantee and credit to that account the number of shares of Common Stock of the Company equal to the number of Units upon which such Restrictions have lapsed plus, in either case, a cash payment equal to the value of any fractional Unit then credited to the Grantee's account.

7. **Withholding Taxes**

The Company is entitled to withhold an amount equal to Motorola's required minimum statutory withholdings taxes for the respective tax jurisdiction attributable to any share of Common Stock or property deliverable in connection with the Units. Grantee may satisfy any withholding obligation in whole or in part by electing to have Motorola retain shares of Common Stock deliverable in connection with the Units having a Fair Market Value on the date the Restrictions applicable to the Units lapse equal to the minimum amount required to be withheld. "Fair Market Value" for this purpose shall be the closing price for a share of Motorola common stock on the last trading day before the date the Restrictions applicable to the Units lapse as reported for the New York Stock Exchange Composite Transaction in the Wall Street Journal, Midwest edition.

8. **Voting and Other Rights**

   a. Grantee shall have no rights as a stockholder of the Company in respect of the Units, including the right to vote and to receive dividends and other distributions, until delivery of certificates representing shares of Common Stock in satisfaction of the Units.

   b. The grant of Units does not confer upon Grantee any right to continue in the employ of the Company or a Motorola Subsidiary or to interfere with the right of the Company or a Motorola Subsidiary, to terminate Grantee's employment at any time.

9. **Funding**

No assets or shares of Common Stock shall be segregated or earmarked by the Company in respect of any Units awarded hereunder. The grant of Units hereunder shall not constitute a trust and shall be solely for the purpose of recording an unsecured contractual obligation of the Company.

10. **Governing Law**

All questions concerning the construction, validity and interpretation of this Award shall be governed by and construed according to the internal law and not the law of conflicts of the State of Illinois.

11. **Waiver**

The failure of the Company to enforce at any time any provision of this Award shall in no way be construed to be a waiver of such provision or any other provision hereof.

12. **Actions by the Committee**

The Committee may delegate its authority to administer this Agreement. The actions and determinations of the Committee or delegate shall be binding upon the parties.

13. **Acceptance of Terms and Conditions**

By electronically accepting this Award within 30 days after the date of the electronic mail notification by the Company to you of the grant of this Award ("Email Notification Date"), you agree to be bound by the foregoing terms and conditions, the 2002 Omnibus Plan and any and all rules and regulations established by Motorola in connection with awards issued under the 2002 Omnibus Plan. If you do not electronically accept this Award

R3 Award Document                                                                          Page 4 of 6

within 30 days of the Email Notification Date you will not be entitled to the Units.

14. **Plan Documents**

The 2002 Omnibus Plan and the Prospectus for the 2002 Omnibus Plan are available at http://myhr.mot.com/finances/stock_options/plan_documents.jsp or from Motorola Global Rewards, 1303 East Algonquin Road, Schaumburg, IL 60196 (847) 576-7885.

Motorola Confidential Proprietary                                            (End of the Award Document)

.R3 Award Document

Motorola Confidential Proprietary

**Printed: March 12, 2008**
**Grant Date: May 03, 2005**

(Beginning of Consideration Agreement)

Motorola Confidential Proprietary

(End of Consideration Agreement)

R3 Award Document

**The recipient has accepted the terms of the Agreement on June 21, 2005**

# EXHIBIT 6

R3 Award Document                                                                    Page 1 of 7

**How to use this document**

The first thing you will see on this website is your Option Award Document. This shows the date you were notified at the top of the first page and describes most of the terms under which the options are granted. It is important to read the Award Document carefully, though it is not necessary that you sign it.

From the Award Document you will scroll down to the Stock Option Consideration Agreement ("SOCA"). Please read the SOCA carefully to help you decide whether you wish to accept its terms to receive the Option Award. After reviewing the SOCA, you are required to "sign" the SOCA as a condition of the grant. In other words, the options will not become yours unless you sign the SOCA within 30 days of the date of your email notification for this option grant.

At the bottom of the SOCA, there is a place for you to indicate that you either "Accept" or "Reject" its terms. "Signing" and agreeing to be bound by the terms of the SOCA will be done by you when you write "Accept" in the appropriate box and confirm your choice by clicking the "Accept" button. If you write and click that you "Accept," all the terms of the SOCA will apply and the SOCA will be a binding contract between you and Motorola. If you "Reject," the options will revert back to Motorola and will NOT become yours. You will forfeit them permanently. If you exit this site without having marked either the "Accept" or "Reject" button, nothing will happen for the first 30 days following the date of your email notification for this option grant. But if you have still not taken action within 30 days of the date of your email notification, your inaction will be treated as a "Reject" and on the 31st day after the date of your email notification you will forfeit the options permanently.

If you "Accept" the SOCA and thus receive the options, you will be able to view both the Award Document and the signed SOCA on the website in the future. Even so, we strongly recommend that that you print out a hard copy of the Award Document and the accepted SOCA for your records. If you "Reject" the SOCA or do nothing and thus forfeit the options, on the 31st day of the date of your email notification you will lose the ability to access any information on the website regarding these options. To print the Award Document, right click now. Select "Print" from the list. Select the desired printer and click "Print." (NOTE: YOU WILL NOT HAVE ACCESS TO THIS INTERNAL WEB SITE ONCE YOU LEAVE MOTOROLA.)

## MOTOROLA, INC.
## AWARD DOCUMENT
### For the
### Motorola Omnibus Incentive Plan of 2006
## Terms and Conditions Related to Employee Nonqualified Stock Options

| Name : | Michael Fenger | Expiration Date : | May 03, 2016 |
|---|---|---|---|
| Commerce ID : | 12028663 | Number of Options : | 25,000 |
| Grant Date : | May 03, 2006 | Exercise Price : | $ 21.25 (USD) |

Motorola, Inc. ("Motorola") is pleased to grant you options to purchase shares of Motorola's common stock under the Motorola Omnibus Incentive Plan of 2006 (the "Plan"). The number of options ("Options") awarded to you and the Exercise Price per Option, which is the Fair Market Value on the Date of Grant, are stated above. Each Option entitles you to purchase one share of Motorola's common stock on the terms described below and in the Plan.

## Vesting Schedule

| Percentage | Date |
|---|---|
| 25.00 | May 03, 2007 |
| 25.00 | May 03, 2008 |
| 25.00 | May 03, 2009 |
| 25.00 | May 03, 2010 |

### Vesting and Exercisability

You cannot exercise the Options until they have vested.

*Regular Vesting* - The Options will vest in accordance with the above schedule (subject to the other terms hereof).

*Special Vesting* - You may be subject to the Special Vesting Dates described below if your employment or service with Motorola or a Subsidiary (as defined below) terminates.

*Exercisability* - You may exercise Options at any time after they vest and before they expire as described below.

### Expiration

All Options expire on the earlier of (1) the Date of Expiration as stated above or (2) any of the Special Expiration Dates described below. Once an Option expires, you no longer have the right to exercise it.

### Special Vesting Dates and Special Expiration Dates

There are events that cause your Options to vest sooner than the Regular Vesting schedule discussed above or to expire sooner than the Date of Expiration as stated above. Those events are as follows:

*Disability* - If your employment or service with Motorola or a Subsidiary is terminated because of your Total and Permanent Disability (as defined below), Options that are not vested will automatically become fully vested upon your termination of employment or service. All your Options will then expire on the earlier of the first anniversary of your termination of employment or service because of your Total and Permanent Disability or the Date of Expiration stated above. Until that time, the Options will be exercisable by you or your guardian or legal representative.

*Death* - If your employment or service with Motorola or a Subsidiary is terminated because of your death, Options that are not vested will automatically become fully vested upon your death. All your Options will then expire on the earlier of the first anniversary of your death or the Date of Expiration stated above. Until that time, with written proof of death and inheritance, the Options will be exercisable by your legal representative, legatees or distributees.

*Change In Control* - If a "Change in Control" of the Company occurs, and the successor corporation does not assume these Options or replace them with options that are at least comparable to these Options, then: (1) all of your unvested Options will be fully vested and (2) all of your Options will be exercisable until the Date of Expiration set forth above.

Further, with respect to any Options that are assumed or replaced as described in the preceding paragraph, such assumed or replaced options shall provide that they will be fully vested and exercisable until the Date of Expiration set forth above if you are involuntarily terminated (for a reason other than "Cause") or if you quit for "Good Reason" within 24

months of the Change in Control. For purposes of this paragraph, the terms "Change in Control", "Cause" and "Good Reason" are defined in the Plan.

*Termination of Employment or Service Because of Serious Misconduct* - If Motorola or a Subsidiary terminates your employment or service because of Serious Misconduct (as defined below) all of your Options (vested and unvested) expire upon your termination.

*Change in Employment in Connection with a Divestiture* - If you accept employment with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfer of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary, or if you remain employed by a Subsidiary that is sold or whose shares are distributed to the Motorola stockholders in a spin-off or similar transaction (a "Divestiture"), all of your unvested Options will automatically expire upon termination of your employment with Motorola, and all of your vested but not yet exercised Options will expire on the earlier of (i) 90 days after such Divestiture or (ii) the Date of Expiration stated above.

*Termination of Employment or Service by Motorola or a Subsidiary Other than for Serious Misconduct or a Divestiture* - If Motorola or a Subsidiary on its initiative, terminates your employment or service other than for Serious Misconduct or a Divestiture, all of your unvested Options will automatically expire upon termination and all of your vested but not yet exercised Options will expire on the earlier of (i) 90 days after your termination of employment or (2) the Date of Expiration stated above.

*Termination of Employment or Service for any Other Reason than Described Above* - If your employment or service with Motorola or a Subsidiary terminates for any reason other than that described above, including voluntary resignation of your employment or service, all of your unvested Options will automatically expire upon termination of your employment or service and all of your vested but not yet exercised Options will expire on the earlier of (i) the date ninety (90) days after the date of termination of your employment or service or (ii) the Date of Expiration stated above.

### Leave of Absence/Temporary Layoff

If you take a Leave of Absence from Motorola or a Subsidiary that your employer has approved in writing in accordance with your employer's Leave of Absence Policy and which does not constitute a termination of employment as determined by Motorola, or you are placed on Temporary Layoff (as defined below) by Motorola or a Subsidiary the following will apply:

*Vesting of Options* - Options will continue to vest in accordance with the vesting schedule set forth above.

*Exercising Options* - You may exercise Options that are vested or that vest during the Leave of Absence or Temporary Layoff.

*Effect of Termination of Employment or Service* - If your employment or service is terminated during the Leave of Absence or Temporary Layoff, the treatment of your Options will be determined as described under "Special Vesting Dates and Special Expiration Dates" above.

### Other Terms

*Method of Exercising* - You must follow the procedures for exercising options established by Motorola from time to time. At the time of exercise, you must pay the Exercise Price for all of the Options being exercised and any taxes that are required to be withheld by Motorola or a Subsidiary in connection with the exercise. Options may not be exercised for less than 50 shares unless the number of shares represented by the Option is less than 50 shares, in which case the Option must be exercised for the remaining amount.

*Transferability* - Unless the Committee provides, Options are not transferable other than by will or the laws of descent and distribution.

*Tax Withholding* - Motorola or a Subsidiary is entitled to withhold an amount equal to the required minimum statutory withholding taxes for the respective tax jurisdictions attributable to any share of common stock deliverable in connection with the exercise of the Options. You may satisfy any withholding obligation in whole or in part by electing to have Motorola retain Option shares having a Fair Market Value on the date of exercise equal to the minimum amount required to be withheld.

### Definition of Terms

If a term is used but not defined, it has the meaning given such term in the Plan.

"Fair Market Value" is the closing price for a share of Motorola common stock on the last trading day before the date of grant or date of exercise, whichever is applicable. The official source for the closing price is the New York Stock Exchange Composite Transaction as reported in the Wall Street Journal, Midwest edition.

"Serious Misconduct" means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

"Subsidiary" means an entity of which Motorola owns directly or indirectly at least 50% and that Motorola consolidates for financial reporting purposes.

"Total and Permanent Disability" means for (x) U.S. employees, entitlement to long-term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan or a determination of a permanent and total disability under a state workers compensation statute and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations.

"Temporary Layoff" means a layoff or redundancy that is communicated as being for a period of up to twelve months and as including a right to recall under defined circumstances.

### Consent to Transfer Personal Data

By accepting this award, you voluntarily acknowledge and consent to the collection, use, processing and transfer of personal data as described in this paragraph. You are not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect your ability to participate in the Plan. Motorola, its Subsidiaries and your employer hold certain personal information about you, that may include your name, home address and telephone number, date of birth, social security number or other employee identification number, salary, salary grade, hire date, nationality, job title, any shares of stock held in Motorola, or details of all options or any other entitlement to shares of stock awarded, canceled, purchased, vested, or unvested, for the purpose of managing and administering the Plan ("Data"). Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of your participation in the Plan, and Motorola and/or any of its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, including the United States. You authorize them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on your behalf to a broker or other third party with whom you may elect to deposit any shares of stock acquired pursuant to the Plan. You may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing your consent may affect your ability to participate in the Plan.

### Acknowledgement of Discretionary Nature of the Plan; No Vested Rights

You acknowledge and agree that the Plan is discretionary in nature and limited in duration, and may be amended, cancelled, or terminated by Motorola or a Subsidiary, in its sole discretion, at any time. The grant of awards under the Plan is a one-time benefit and does not create any contractual or other right to receive an award in the future or to future employment. Nor shall this or any such grant interfere with your right or the Company's right to terminate such employment relationship at any time, with or without cause, to the extent permitted by applicable laws and any enforceable agreement between you and the Company. Future grants, if any, will be at the sole discretion of Motorola, including, but not limited to, the timing of any grant, the amount of the award, vesting provisions, and the exercise price.

### No Relation to Other Benefits/Termination Indemnities

Your acceptance of this award and participation under the Plan is voluntary. The value of your stock option awarded herein is an extraordinary item of compensation outside the scope of your employment contract, if any. As such, the stock option is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension, or retirement benefits or similar payments, notwithstanding any provision of any compensation, insurance agreement or benefit plan to the contrary.

### Agreement Following Termination of Employment

As a further condition of accepting the Options, you acknowledge and agree that for a period of two years following your termination of employment or service, you will not hire, recruit, solicit or induce, or cause, allow, permit or aid others to hire, recruit, solicit or induce, or to communicate in support of those activities, any employee of Motorola or a Subsidiary to terminate his/her employment with Motorola or a Subsidiary and/or to seek employment with your new or prospective employer, or any other company.

You agree that upon termination of employment with Motorola or a Subsidiary, you will immediately inform Motorola of (i) the identity of your new employer (or the nature of any start-up business or self-employment), (ii) your new title, and (iii) your job duties and responsibilities. You hereby authorize Motorola or a Subsidiary to provide a copy of this Award Document to your new employer. You further agree to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine your compliance with the terms hereof.

### Substitute Stock Appreciation Right

Motorola reserves the right to substitute a Stock Appreciation Right for your Option in the event certain changes are made in the accounting treatment of stock options. Any substitute Stock Appreciation Right shall be applicable to the same number of shares as your Option and shall have the same Date of Expiration, Exercise Price, and other terms and conditions. Any substitute Stock Appreciation Right may be settled only in common stock.

R3 Award Document ( ( Page 5 of 7

**Acceptance of Terms and Conditions**

By accepting the Options, you agree to be bound by these terms and conditions, the Plan, any and all rules and regulations established by Motorola in connection with awards issued under the Plan, and any additional covenants or promises Motorola may require as a condition of the grant.

**Other Information about Your Options and the Plan**

You can find other information about options and the Plan on the Motorola website http://myhr.mot.com/finances/stock_options/index.jsp If you do not have access to the website, please contact Motorola Global Rewards, 1303 E. Algonquin Road, Schaumburg, IL 60196 USA; GBLRW01@Motorola.com; 847-576-7885; for an order form to request Plan documents.

[X] Motorola, Inc.

**Printed: March 12, 2008**

# STOCK OPTION CONSIDERATION AGREEMENT

**Grant Date: May 03, 2006**

The following Agreement is established to protect the trade secrets, intellectual property, confidential information, customer relationships and goodwill of Motorola, Inc. and each of its subsidiaries (the "Company") both as defined in the Motorola Omnibus Incentive Plan of 2006 (the "2006 Plan").

As consideration for the stock option(s) granted to me on the date shown above under the terms of the 2006 Plan ("the Covered Options"), and Motorola having provided me with Confidential Information as a Motorola appointed vice president or elected officer, I agree to the following:

1. I agree that during the course of my employment and thereafter, I will not use or disclose, except on behalf of the Company and pursuant to its directions during the course of my employment, any Company Confidential Information. Confidential Information means information concerning the Company and its business that is not generally known outside the Company. Confidential Information includes: (i) trade secrets; (ii) intellectual property; (iii) the Company's methods of operation and Company processes; (iv) information regarding the Company's present and/or future products, developments, processes and systems, including invention disclosures and patent applications; (v) information on customers or potential customers, including customer's names, sales records, prices, and other terms of sales and Company cost information; (vi) Company personnel data; (vii) Company business plans, marketing plans, financial data and projections; and (viii) information received in confidence by the Company from third parties. Information regarding products or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company or one of its affiliates is considering for broader use, shall not be deemed generally known until such broader use is actually commercially implemented.

2. I agree that during my employment and for a period of two years following my termination of employment for any reason, I will not hire, recruit, solicit or induce, or cause, allow, permit or aid others to hire, recruit, solicit or induce, or to communicate in support of those activities, any employee of the Company who possesses Confidential Information of the Company to terminate his/her employment with the Company and/or to seek employment with my new or prospective employer, or any other company.

3. I agree that during my employment and for a period of two years following the termination of my employment for any reason, I will not engage in activities which are entirely or in part the same as or similar to activities in which I engaged at any time during the two years preceding termination of my employment, for any person, company or entity in connection with products, services or technological developments (existing or planned) that are entirely or in part the same as, similar to, or competitive with, any products, services or technological developments (existing or planned) on which I worked at any time during the two years preceding the termination of my employment. This paragraph applies in the countries in which I have physically been present performing work for the Company at any time during the two years preceding termination of my employment.

4. I agree that during my employment and for a period of two years following the termination of my employment for any reason, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, solicit or participate in soliciting, products or services competitive with or similar to products or services offered by, manufactured by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer for such products or services and with which I had direct or indirect contact regarding those products or services or about which I learned Confidential Information at any time during the two years prior to my termination of employment with the Company.

5. I agree that during my employment and for a period of two years following the termination of my employment for any reason, I will not directly or indirectly, in any capacity, provide products or services competitive with or similar to products or services offered by the Company to any person, company or entity which was a customer for such products or services and with which customer I had direct or indirect contact regarding those products or services or about which customer I learned Confidential Information at any time during the two years prior to termination of my employment with the Company.

R3 Award Document             (                            (            Page 6 of 7

6.   I agree that by accepting the Covered Options, if I violate the terms of paragraphs 1 through and including 5 of this Agreement, then, in addition to any other remedies available in law and/or equity, all of my vested and unvested Covered Options will terminate and no longer be exercisable, and for all Covered Options exercised within two years prior to the termination of my employment for any reason or anytime after termination of my employment for any reason, I will immediately pay to the Company the difference between the exercise price on the date of grant as reflected in the Award Document for the Covered Options and the market price of the Covered Options on the date of exercise (the "spread").

7.   The requirements of this agreement can be waived or modified only upon the prior written consent of Motorola, Inc. I acknowledge that the promises in this Agreement, not any employment of or services performed by me in the course and scope of that employment, are the sole consideration for the Covered Options. I agree the Company shall have the right to assign this Agreement which shall not affect the validity or enforceability of this Agreement. This Agreement shall inure to the benefit of the Company assigns and successors.

8.   I agree that during my employment and for a period of two years following the termination of my employment for any reason, I will immediately inform the Company of (i) the identity of my new employer (or the nature of any start-up business, consulting arrangements or self-employment), (ii) my new title, and (iii) my job duties and responsibilities. I hereby authorize the Company to provide a copy of this Agreement to my new employer. I further agree to provide information to the Company as may from time to time be requested in order to determine my compliance with the terms of this Agreement.

9.   I acknowledge that the harm caused to the Company by the breach or anticipated breach of paragraphs 1, 2, 3, 4, and/or 5 of this Agreement will be irreparable and I agree the Company may obtain injunctive relief against me in addition to and cumulative with any other legal or equitable rights and remedies the Company may have pursuant to this Agreement, any other agreements between me and the Company for the protection of the Company's Confidential Information, or law, including the recovery of liquidated damages. I agree that any interim or final equitable relief entered by a court of competent jurisdiction, as specified in paragraph 12 below, will, at the request of the Company, be entered on consent and enforced by any such court having jurisdiction over me. This relief would occur without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

10.   With respect to the subject matter hereof, this Agreement is my entire agreement with the Company. No waiver of any breach of any provision of this Agreement by the Company shall be construed to be a waiver of any succeeding breach or as a modification of such provision. The provisions of this Agreement shall be severable and in the event that any provision of this Agreement shall be found by any court as specified in paragraph 12 below to be unenforceable, in whole or in part, the remainder of this Agreement shall nevertheless be enforceable and binding on the parties. I also agree that the court may modify any invalid, overbroad or unenforceable term of this Agreement so that such term, as modified, is valid and enforceable under applicable law. Further, I affirmatively state that I have not, will not and cannot rely on any representations not expressly made herein.

11.   I accept the terms of this Agreement and the above option(s) to purchase shares of the Common Stock of the Company, subject to the terms of this Agreement, the 2006 Plan, and any Award Document issued pursuant thereto. I am familiar with the 2006 Plan and agree to be bound by it to the extent applicable, as well as by the actions of the Company's Board of Directors or any committee thereof.

12.   I agree that this Agreement and the 2006 Plan, and any Award Document issued pursuant thereto, together constitute an agreement between the Company and me. I further agree that this Agreement is governed by the laws of Illinois, without giving effect to any state's principles of Conflicts of Laws, and any legal action related to this Agreement shall be brought only in a federal or state court located in Illinois, USA.

I accept the jurisdiction of these courts and consent to service of process from said courts solely for legal actions related to this Agreement and the Covered Options.

*(End of the Consideration Agreement)*

**The recipient has accepted the terms of the Agreement on June 18, 2006**

FILED: AUGUST 8, 2008
08CV4512
JUDGE ZAGEL
MAGISTRATE JUDGE KEYS

JFB

# EXHIBIT 7

R3 Award Document                                                    Page 1 of 8

## How to use this document

The first thing you will see on this website is your Restricted Stock Unit ("RSU") Award Document ("Award Document"). This shows the grant date at the top of the first page and describes the terms of the Award. After reviewing the Award Document, you are required to "electronically sign" the Award Document as a condition of the grant.

In other words, the RSUs will not become yours unless you sign the Award Agreement within 30 days of the date of your email notification for this RSU grant.

At the bottom of the Award Document, there is a place for you to indicate that you either "Accept" or "Reject" its terms. "Signing" and agreeing to be bound by the terms of the Award Document will be done by you when you write "Accept" in the appropriate box and confirm your choice by clicking the "Accept" button. If you write and click that you "Accept," the RSUs will become yours. By accepting, all the terms of the Award Document will apply and the Award Document will be a binding contract between you and Motorola. If you "Reject," the RSUs will revert back to Motorola and will NOT become yours. You will forfeit them permanently. If you exit this site without having marked either the "Accept" or "Reject" button, nothing will happen for the first 30 days following the date of your email notification for this RSU grant. But if you have still not taken action within 30 days of the date of your email notification, your inaction will be treated as a "Reject" and on the 31st day after the date of your email notification you will forfeit the RSUs permanently.

If you "Accept" the Award Document and thus receive the RSUs, you will be able to view the Award Document on the website in the future. Even so, we strongly recommend that you print out a hard copy of the Award Document for your records. If you "Reject" the Award Document or do nothing and thus forfeit the RSUs, on the 31st day after the date of your email notification you will lose the ability to access the information on the website regrding these RSUs. To print the Award Document, right click now. Select "Print" from the list. Select the desired printer and click "Print." (NOTE: YOU WILL NOT HAVE ACCESS TO THIS INTERNAL WEB SITE ONCE YOU LEAVE MOTOROLA.)

Motorola Confidential Proprietary                                          (Beginning of the Award Document)

# RESTRICTED STOCK UNIT AWARD AGREEMENT

This Restricted Stock Units Award (the "Award") is made this March 09, 2007 ("Date of Grant"), by Motorola, Inc. (the "Company" or "Motorola") to Michael Fenger (the "Grantee").

WHEREAS, Grantee is receiving the Award under the Motorola Omnibus Incentive Plan of 2006, as amended (the "2006 Incentive Plan");

WHEREAS, the Award is being made as a special grant of Motorola restricted stock units authorized by the Board of Directors and the Board's Compensation and Leadership Committee (the "Compensation Committee"); and

WHEREAS, it is a condition to Grantee receiving the Award that Grantee electronically accept the terms, conditions and Restrictions applicable to the restricted stock units as set forth in this agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the Company hereby awards restricted stock units to Grantee on the following terms and conditions:

1. **Award of Restricted Stock Units** The Company hereby awards to Grantee a total of Fifteen Thousand(15,000) Motorola restricted stock Units (the "Units") subject to the terms and conditions set forth below. All Awards shall be paid in whole shares of Motorola Common Stock ("Common Stock"); no fractional shares shall be credited or delivered to Grantee.

2. **Restrictions.** The Units are being awarded to Grantee subject to the transfer and forfeiture conditions set forth below (the "Restrictions") which shall lapse, if at all, as described in Section 3 below. For purposes of this Award, the term Units includes any additional Units granted to the Grantee with respect to Units, still subject to the Restrictions.

   a. Grantee may not directly or indirectly, by operation of law or otherwise, voluntarily or involuntarily, sell, assign, pledge, encumber, charge or otherwise transfer any of the Units still subject to Restrictions. The Units shall be forfeited if Grantee violates or attempts to violate these transfer Restrictions. Motorola shall have the right to assign this Agreement, which shall not affect the validity or enforceability of this Agreement. This Agreement shall inure to the benefit of assigns and successors of Motorola.

   b. Any Units still subject to the Restrictions shall be (x) automatically forfeited upon the Grantee's termination of employment with Motorola or a Subsidiary for any reason other than death, Total and Permanent Disability, or Involuntary Termination due to (i) a Divestiture or (ii) for a reason other than for Serious Misconduct, and (y) at the discretion of the Compensation Committee forfeited, if the Grantee is not an appointed vice president or officer of Motorola at the end of the "Restriction Period" as defined below. For purposes of this Agreement, a "Subsidiary" is any corporation or other entity in which a 50 percent or greater interest is held directly or indirectly by Motorola and which is consolidated for financial reporting purposes. Total and Permanent Disability is defined in Section 3(a).

   c. If Grantee is a vice president or elected officer on the date of the Award, or has been approved to become a vice president or elected officer on the date of the Award, and Grantee engages in any of the following conduct, in addition to all remedies in law and/or equity available to the Company or any Subsidiary, Grantee shall forfeit all restricted stock units under the Award whose Restrictions have not lapsed, and, for all restricted stock units under the Award whose Restrictions have lapsed, Grantee shall immediately pay to the Company the Fair Market Value (as defined in paragraph 7 below) of Motorola Common Stock ("Common Stock") on the date(s) such Restrictions lapsed, without regard to any taxes that may have been deducted from such amount. For purposes of subparagraphs (i) through and including (iii) below, "Company" or "Motorola" shall mean Motorola Inc. and/or any of its Subsidiaries:

      i. During the course of Grantee's employment and thereafter, Grantee uses or discloses, except on behalf of the Company and pursuant to the Company's directions, any Company Confidential Information. "Confidential Information" means information concerning the Company and its business that is not generally known outside the Company, and includes (A) trade secrets; (B) intellectual property; (C) the Company's methods of operation and Company processes; (D) information regarding the Company's present and/or future products, developments, processes and systems, including invention disclosures and patent applications; (E) information on customers or potential customers, including customers' names, sales records, prices, and other terms of sales and Company cost information; (F) Company personnel data; (G) Company business plans, marketing plans, financial data and

projections; and (H) information received in confidence by the Company from third parties. Information regarding products, services or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company or one of its affiliates is considering for broader use, shall be deemed not generally known until such broader use is actually commercially implemented; and/or

ii.    During Grantee's employment and for a period of one year following the termination of Grantee's employment for any reason, Grantee hires, recruits, solicits or induces, or causes, allows, permits or aids others to hire, recruit, solicit or induce, or to communicate in support of those activities, any employee of the Company who possesses Confidential Information of the Company to terminate his/her employment with the Company and/or to seek employment with Grantee's new or prospective employer, or any other company; and/or

iii.   During Grantee's employment and for a period of one year following the termination of Grantee's employment for any reason Grantee, directly or indirectly, on behalf of Grantee or any other person, company or entity, solicits or participates in soliciting, products or services competitive with or similar to products or services offered by, manufactured by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer for such products or services and with which Grantee had direct or indirect contact regarding those products or services or about which Grantee learned Confidential Information at any time during the two years prior to Grantee's termination of employment with the Company.

d.    If Grantee is not a vice president or elected officer on the date of the Award, or has not been approved to become a vice president or elected officer on the date of the Award, and Grantee engages in any of the conduct outlined in paragraph 2(c)(i) or (ii) above, in addition, to all remedies in law and/or equity available to the Company or any Subsidiary, Grantee shall forfeit all restricted stock units under the Award whose Restrictions have not lapsed, and, for all restricted stock units under the Award whose Restrictions have lapsed, Grantee shall immediately pay to the Company the Fair Market Value (as defined in paragraph 7 below) of Motorola Common Stock ("Common Stock") on the date(s) such Restrictions lapsed, without regard to any taxes that may have been deducted from such amount. For purposes of paragraphs 2(c)(i) and (ii) above, "Company" or "Motorola" shall mean Motorola, Inc. and/or any of its Subsidiaries.

e.    The Company will not be obligated to pay Grantee any consideration whatsoever for forfeited Units.

3.  **Lapse of Restrictions.**

a.    Except as set forth in Section 3(b) below, the Restrictions applicable to the Units shall lapse, as long as the Units have not been forfeited as described in Section 2 above, as follows:

i.    Two ( 2 ) years from the Date of Grant (the "Restricted Period");

ii.   If a Change in Control of the Company occurs and the successor corporation (or parent thereof) does not assume this Award or replace it with a comparable award; provided, further, that with respect to any Award that is assumed or replaced, such assumed or replaced awards shall provide that the Restrictions shall lapse for any Participant that is involuntarily terminated (for a reason other than "Cause") or quits for "Good Reason" within 24 months of the Change in Control. For purposes of this paragraph, the terms "Change in Control", "Cause" and "Good Reason" are defined in the 2006 Incentive Plan;

iii.  Upon termination of Grantee's employment by Motorola or a Subsidiary by Total and Permanent Disability. "Total and Permanent Disability" means for (x) U.S. employees, entitlement to long term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan or a determination of a permanent and total disability under a state workers compensation statute and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations; or

iv.   If the Grantee dies.

b.    In the case of Involuntary Termination due to a Divestiture or for a reason other than for Serious Misconduct before the expiration of the Restriction Period, if the Units have not been forfeited as described in Section 2 above, then the Restrictions shall lapse on a pro rata basis determined by dividing (i) the number of completed full years of service by the Grantee from the Award Date to the employee's date of termination by (ii) the total length of the Restriction Period.

c.    "Termination due to a Divestiture" for purposes of this Agreement means if Grantee accepts employment

with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfer of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary, or if Grantee remains employed by a Subsidiary that is sold or whose shares are distributed to the Motorola stockholders in a spin-off or similar transaction (a "Divestiture").

d.    "Serious Misconduct" for purposes of this Agreement means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

e.    If, during the Restriction Period, the Grantee takes a Leave of Absence from Motorola or a Subsidiary, the Units will continue to be subject to this Agreement. If the Restriction Period expires while the Grantee is on a Leave of Absence the Grantee will be entitled to the Units even if the Grantee has not returned to active employment. "Leave of Absence" means an approved leave of absence from Motorola or a Subsidiary that is not a termination of employment, as determined by Motorola.

f.    To the extent the Restrictions lapse under this Section 3 with respect to the Units, they will be free of the terms and conditions of this Award (other than Section 2(c)).

4.    **Adjustments.**
If the number of outstanding shares of Common Stock is changed as a result of a stock split or the like without additional consideration to the Company, the number of Units subject to this Award shall be adjusted to correspond to the change in the outstanding shares of Common Stock.

5.    **Dividends.**
No dividends (or dividend equivalents) shall be paid with respect to Units credited to the Grantee's account.

6.    **Delivery of Certificates or Equivalent.**
Upon the lapse of Restrictions applicable to the Units, the Company shall, at its election, either (i) deliver to the Grantee a certificate representing a number of shares of Common Stock equal to the number of Units upon which such Restrictions have lapsed, or (ii) establish a brokerage account for the Grantee and credit to that account the number of shares of Common Stock of the Company equal to the number of Units upon which such Restrictions have lapsed.

7.    **Withholding Taxes.**
The Company is entitled to withhold applicable taxes for the respective tax jurisdiction attributable to this Award or any payment made in connection with the Units. Grantee may satisfy any minimum withholding obligation by electing to have the plan administrator retain shares of Common Stock deliverable in connection with the Units having a Fair Market Value on the date the Restrictions applicable to the Units lapse equal to the amount to be withheld. "Fair Market Value" for this purpose shall be the closing price for a share of Common Stock on the day the Restrictions applicable to the Units lapse as reported for the New York Stock Exchange- Composite Transactions in the Wall Street Journal, Midwest edition.

8.    **Voting and Other Rights.**

a.    Grantee shall have no rights as a stockholder of the Company in respect of the Units, including the right to vote and to receive cash dividends and other distributions until delivery of certificates representing shares of Common Stock in satisfaction of the Units.

b.    The grant of Units does not confer upon Grantee any right to continue in the employ of the Company or a Subsidiary or to interfere with the right of the Company or a Subsidiary, to terminate Grantee's employment at any time.

9.    **Agreement Following Termination of Employment.**
Grantee agrees that upon termination of employment with Motorola or a Subsidiary, Grantee will immediately inform Motorola of (a) the identity of any new employer (or the nature of any start-up business or self-employment), (b) Grantee's new title, and (c) Grantee's job duties and responsibilities. Grantee hereby authorizes Motorola or a Subsidiary to provide a copy of this Award Document to Grantee's new employer. Grantee further agrees to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine his/her compliance with the terms hereof.

10.   **Consent to Transfer Personal Data.**
By accepting this award, Grantee voluntarily acknowledges and consents to the collection, use, processing and transfer of personal data as described in this paragraph. Grantee is not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect Grantee's ability to participate in the Plan. Motorola, its Subsidiaries and Grantee's employer hold certain personal information about the Grantee, that may include his/her name, home address and telephone number, date of birth, social security number or other employee identification number, salary grade, hire data, salary, nationality,

job title, any shares of stock held in Motorola, or details of all restricted stock units or any other entitlement to shares of stock awarded, canceled, purchased, vested, or unvested, for the purpose of managing and administering the Plan ("Data"). Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of Grantee's participation in the Plan, and Motorola and/or any of its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, including the United States. Grantee authorizes them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing Grantee's participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on the Grantee's behalf to a broker or other third party with whom the Grantee may elect to deposit any shares of stock acquired pursuant to the Plan. Grantee may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing consent may affect the Grantee's ability to participate in the Plan.

11.  **Nature of Award.**
      By accepting this Award Agreement, the Grantee acknowledges his or her understanding that the grant of Units under this Award Agreement is completely at the discretion of Motorola, and that Motorola's decision to make this Award in no way implies that similar awards may be granted in the future or that Grantee has any guarantee of future employment. Nor shall this or any such grant interfere with Grantee's right or the Company's right to terminate such employment relationship at any time, with or without cause, to the extent permitted by applicable laws and any enforceable agreement between Grantee and the Company. In addition, the Grantee hereby acknowledges that he or she has entered into employment with Motorola or a Subsidiary upon terms that did not include this Award or similar awards, that his or her decision to continue employment is not dependent on an expectation of this Award or similar awards, and that any amount received under this Award is considered an amount in addition to that which the Grantee expects to be paid for the performance of his or her services. Grantee's acceptance of this Award is voluntary. The Award is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension, or retirement benefits or similar payments, notwithstanding any provision of any compensation, insurance agreement or benefit plan to the contrary.

12.  **Remedies for Breach.**
      Grantee hereby acknowledges that the harm caused to the Company by the breach or anticipated breach of paragraphs 2(c)(i), (ii) and/or (iii) of this Agreement will be irreparable and further agrees the Company may obtain injunctive relief against the Grantee in addition to and cumulative with any other legal or equitable rights and remedies the Company may have pursuant to this Agreement, any other agreements between the Grantee and the Company for the protection of the Company's Confidential Information, or law, including the recovery of liquidated damages. Grantee agrees that any interim or final equitable relief entered by a court of competent jurisdiction, as specified in paragraph 15 below, will, at the request of the Company, be entered on consent and enforced by any such court having jurisdiction over the Grantee. This relief would occur without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

13.  **Acknowledgements.**
      With respect to the subject matter of paragraphs 2(c)(i), (ii), and (iii), and paragraphs 12 and 15 hereof, this Agreement is the entire agreement with the Company. No waiver of any breach or any provision of this Agreement by the Company shall be construed to be a waiver of any succeeding breach or as a modification of such provision. The provisions of this Agreement shall be severable and in the event that any provision of this Agreement shall be found by any court as specified in paragraph 15 below to be unenforceable, in whole or in part, the remainder of this Agreement shall nevertheless be enforceable and binding on the parties. Grantee hereby agrees that the court may modify any invalid, overbroad or unenforceable term of this Agreement so that such term, as modified, is valid and enforceable under applicable law. Further, by accepting any Award under this Agreement, Grantee affirmatively states that (s)he has not, will not and cannot rely on any representations not expressly made herein.

14.  **Funding.**
      No assets or shares of Common Stock shall be segregated or earmarked by the Company in respect of any Units awarded hereunder. The grant of Units hereunder shall not constitute a trust and shall be solely for the purpose of recording an unsecured contractual obligation of the Company.

15.  **Governing Law.**
      All questions concerning the construction, validity and interpretation of this Award shall be governed by and construed according to the law of the State of Illinois without regard to any state's conflicts of law principles. Any disputes regarding this Award or Agreement shall be brought only in the state or federal courts of Illinois.

16. **Waiver.**
The failure of the Company to enforce at any time any provision of this Award shall in no way be construed to be a waiver of such provision or any other provision hereof.

17. **Actions by the Compensation Committee**
The Committee may delegate its authority to administer this Agreement. The actions and determinations of the Compensation Committee or its delegate shall be binding upon the parties.

18. **Acceptance of Terms and Conditions.**
By electronically accepting this Award within 30 days after the date of the electronic mail notification by the Company to Grantee of the grant of this Award ("Email Notification Date"), Grantee agrees to be bound by the foregoing terms and conditions, the 2006 Incentive Plan and any and all rules and regulations established by Motorola in connection with awards issued under the 2006 Incentive Plan. If Grantee does not electronically accept this Award within 30 days of the Email Notification Date, Grantee will not be entitled to the Units.

19. **Plan Documents.**
The 2006 Incentive Plan and the Prospectus for the 2006 Incentive Plan are available at http://myhr.mot.com/pay_finances/awards_incentives/stock_options/plan_documents.jsp or from Global Rewards, 1303 East Algonquin Road, Schaumburg, IL 60196 (847) 576-7885.

Motorola Confidential Proprietary                    (End of the Award Document)

R3 Award Document

Motorola Confidential Proprietary                    (Beginning of Consideration Agreement)

**Printed: March 12, 2008**
**Grant Date: March 09, 2007**

Motorola Confidential Proprietary                    (End of Consideration Agreement)

Case 1:08-cv-04512     Document 1-4     Filed 08/08/2008     Page 9 of 26

**The recipient has accepted the terms of the Agreement on April 16, 2007**

# EXHIBIT 8

R3 Award Document                                                                    Page 1 of 7

## How to use this document

The first thing you will see on this website is your Option Award Document. This shows the date you were notified at the top of the first page and describes most of the terms under which the options are granted. It is important to read the Award Document carefully, though it is not necessary that you sign it.

From the Award Document you will scroll down to the Stock Option Consideration Agreement ("SOCA"). Please read the SOCA carefully to help you decide whether you wish to accept its terms to receive the Option Award. After reviewing the SOCA, you are required to "sign" the SOCA as a condition of the grant. In other words, the options will not become yours unless you sign the SOCA within 30 days of the date of your email notification for this option grant.

At the bottom of the SOCA, there is a place for you to indicate that you either "Accept" or "Reject" its terms. "Signing" and agreeing to be bound by the terms of the SOCA will be done by you when you write "Accept" in the appropriate box and confirm your choice by clicking the "Accept" button. If you write and click that you "Accept," all the terms of the SOCA will apply and the SOCA will be a binding contract between you and Motorola. If you "Reject," the options will revert back to Motorola and will NOT become yours. You will forfeit them permanently. If you exit this site without having marked either the "Accept" or "Reject" button, nothing will happen for the first 30 days following the date of your email notification for this option grant. But if you have still not taken action within 30 days of the date of your email notification, your inaction will be treated as a "Reject" and on the 31st day after the date of your email notification you will forfeit the options permanently.

If you "Accept" the SOCA and thus receive the options, you will be able to view both the Award Document and the signed SOCA on the website in the future. Even so, we strongly recommend that that you print out a hard copy of the Award Document and the accepted SOCA for your records. If you "Reject" the SOCA or do nothing and thus forfeit the options, on the 31st day of the date of your email notification you will lose the ability to access any information on the website regarding these options. To print the Award Document, right click now. Select "Print" from the list. Select the desired printer and click "Print." (NOTE: YOU WILL NOT HAVE ACCESS TO THIS INTERNAL WEB SITE ONCE YOU LEAVE MOTOROLA.)

### MOTOROLA, INC.
### AWARD DOCUMENT
### For the
### Motorola Omnibus Incentive Plan of 2006
### Terms and Conditions Related to Employee Nonqualified Stock Options

| Name : | Michael Fenger | Expiration Date : | May 08, 2017 |
|---|---|---|---|
| Commerce ID : | 12028663 | Number of Options : | 25,000 |
| Grant Date : | May 08, 2007 | Exercise Price : | $ 17.70 (USD) |

Motorola, Inc. ("Motorola" or "the Company") is pleased to grant you options to purchase shares of Motorola's common stock under the Motorola Omnibus Incentive Plan of 2006 (the "Plan"). The number of options ("Options") awarded to you and the Exercise Price per Option, which is the Fair Market Value on the Date of Grant, are stated above. Each Option entitles you to purchase one share of Motorola's common stock on the terms described below and in the Plan.

## Vesting Schedule

| Percentage | Date |
|---|---|
| 25.00 | May 08, 2008 |
| 25.00 | May 08, 2009 |
| 25.00 | May 08, 2010 |
| 25.00 | May 08, 2011 |

### Vesting and Exercisability

You cannot exercise the Options until they have vested.

*Regular Vesting* - The Options will vest in accordance with the above schedule (subject to the other terms hereof).

*Special Vesting* - You may be subject to the Special Vesting Dates described below if your employment or service with Motorola or a Subsidiary (as defined below) terminates.

*Exercisability* - You may exercise Options at any time after they vest and before they expire as described below.

### Expiration

All Options expire on the earlier of (1) the Date of Expiration as stated above or (2) any of the Special Expiration Dates described below. Once an Option expires, you no longer have the right to exercise it.

### Special Vesting Dates and Special Expiration Dates

There are events that cause your Options to vest sooner than the Regular Vesting schedule discussed above or to expire sooner than the Date of Expiration as stated above. Those events are as follows:

*Disability* - If your employment or service with Motorola or a Subsidiary is terminated because of your Total and Permanent Disability (as defined below), Options that are not vested will automatically become fully vested upon your termination of employment or service. All your Options will then expire on the earlier of the first anniversary of your termination of employment or service because of your Total and Permanent Disability or the Date of Expiration stated above. Until that time, the Options will be exercisable by you or your guardian or legal representative.

*Death* - If your employment or service with Motorola or a Subsidiary is terminated because of your death, Options that are not vested will automatically become fully vested upon your death. All your Options will then expire on the earlier of the first anniversary of your death or the Date of Expiration stated above. Until that time, with written proof of death and inheritance, the Options will be exercisable by your legal representative, legatees or distributees.

*Change In Control* - If a "Change in Control" of the Company occurs, and the successor corporation does not assume these Options or replace them with options that are at least comparable to these Options, then: (1) all of your unvested Options will be fully vested and (2) all of your Options will be exercisable until the Date of Expiration set forth above.

Further, with respect to any Options that are assumed or replaced as described in the preceding paragraph, such assumed or replaced options shall provide that they will be fully vested and exercisable until the Date of Expiration set forth above if you are involuntarily terminated (for a reason other than "Cause") or if you quit for "Good Reason" within 24

months of the Change in Control. For purposes of this paragraph, the terms "Change in Control", "Cause" and "Good Reason" are defined in the Plan.

*Termination of Employment or Service Because of Serious Misconduct* - If Motorola or a Subsidiary terminates your employment or service because of Serious Misconduct (as defined below) all of your Options (vested and unvested) expire upon your termination.

*Change in Employment in Connection with a Divestiture* - If you accept employment with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfer of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary, or if you remain employed by a Subsidiary that is sold or whose shares are distributed to the Motorola stockholders in a spin-off or similar transaction (a "Divestiture"), all of your unvested Options will automatically expire upon termination of your employment with Motorola, and all of your vested but not yet exercised Options will expire on the earlier of (i) 90 days after such Divestiture or (ii) the Date of Expiration stated above.

*Termination of Employment or Service by Motorola or a Subsidiary Other than for Serious Misconduct or a Divestiture* - If Motorola or a Subsidiary on its initiative, terminates your employment or service other than for Serious Misconduct or a Divestiture, all of your unvested Options will automatically expire upon termination and all of your vested but not yet exercised Options will expire on the earlier of (i) 90 days after your termination of employment or (ii) the Date of Expiration stated above.

*Termination of Employment or Service for any Other Reason than Described Above* - If your employment or service with Motorola or a Subsidiary terminates for any reason other than that described above, including voluntary resignation of your employment or service, all of your unvested Options will automatically expire upon termination of your employment or service and all of your vested but not yet exercised Options will expire on the earlier of (i) the date ninety (90) days after the date of termination of your employment or service or (ii) the Date of Expiration stated above.

### Leave of Absence/Temporary Layoff

If you take a Leave of Absence from Motorola or a Subsidiary that your employer has approved in writing in accordance with your employer's Leave of Absence Policy and which does not constitute a termination of employment as determined by Motorola, or you are placed on Temporary Layoff (as defined below) by Motorola or a Subsidiary the following will apply:

*Vesting of Options* - Options will continue to vest in accordance with the vesting schedule set forth above.

*Exercising Options* - You may exercise Options that are vested or that vest during the Leave of Absence or Temporary Layoff.

*Effect of Termination of Employment or Service* - If your employment or service is terminated during the Leave of Absence or Temporary Layoff, the treatment of your Options will be determined as described under "Special Vesting Dates and Special Expiration Dates" above.

### Other Terms

*Method of Exercising* - You must follow the procedures for exercising options established by Motorola from time to time. At the time of exercise, you must pay the Exercise Price for all of the Options being exercised and any taxes that are required to be withheld by Motorola or a Subsidiary in connection with the exercise. Options may not be exercised for less than 50 shares unless the number of shares represented by the Option is less than 50 shares, in which case the Option must be exercised for the remaining amount.

*Transferability* - Unless the Committee provides, Options are not transferable other than by will or the laws of descent and distribution.

*Tax Withholding* - Motorola or a Subsidiary is entitled to withhold an amount equal to the required minimum statutory withholding taxes for the respective tax jurisdictions attributable to any share of common stock deliverable in connection with the exercise of the Options. You may satisfy any minimum withholding obligation and any additional withholding, if desired, by electing to have the plan administrator retain Option shares having a Fair Market Value on the date of exercise equal to the amount to be withheld.

### Definition of Terms

If a term is used but not defined, it has the meaning given such term in the Plan. "Confidential Information" means information concerning the Company and its business that is not generally known outside the Company, and includes (A) trade secrets; (B) intellectual property; (C) the Company's methods of operation and Company processes; (D) information regarding the Company's present and/or future products, developments, processes and systems, including invention disclosures and patent applications; (E) information on customers or potential customers, including customers' names, sales records, prices, and other terms of sales and Company cost information; (F) Company personnel data; (G) Company business plans, marketing plans, financial data and projections; and (H) information received in confidence by the

Company from third parties. Information regarding products, services or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company or one of its affiliates is considering for broader use, shall be deemed generally known until such broader use is actually commercially implemented.

"Fair Market Value" is the closing price for a share of Motorola common stock on the date of grant or date of exercise, whichever is applicable. The official source for the closing price is the New York Stock Exchange Composite Transaction as reported in the Wall Street Journal, Midwest edition.

"Serious Misconduct" means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

"Subsidiary" means an entity of which Motorola owns directly or indirectly at least 50% and that Motorola consolidates for financial reporting purposes.

"Total and Permanent Disability" means for (x) U.S. employees, entitlement to long-term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan or a determination of a permanent and total disability under a state workers compensation statute and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations.

"Temporary Layoff" means a layoff or redundancy that is communicated as being for a period of up to twelve months and as including a right to recall under defined circumstances.

### Consent to Transfer Personal Data

By accepting this award, you voluntarily acknowledge and consent to the collection, use, processing and transfer of personal data as described in this paragraph. You are not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect your ability to participate in the Plan. Motorola, its Subsidiaries and your employer hold certain personal information about you, that may include your name, home address and telephone number, date of birth, social security number or other employee identification number, salary, salary grade, hire date, nationality, job title, any shares of stock held in Motorola, or details of all options or any other entitlement to shares of stock awarded, canceled, purchased, vested, or unvested, for the purpose of managing and administering the Plan ("Data"). Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of your participation in the Plan, and Motorola and/or any of its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, including the United States. You authorize them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on your behalf to a broker or other third party with whom you may elect to deposit any shares of stock acquired pursuant to the Plan. You may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing your consent may affect your ability to participate in the Plan.

### Acknowledgement of Discretionary Nature of the Plan; No Vested Rights

You acknowledge and agree that the Plan is discretionary in nature and limited in duration, and may be amended, cancelled, or terminated by Motorola or a Subsidiary, in its sole discretion, at any time. The grant of awards under the Plan is a one-time benefit and does not create any contractual or other right to receive an award in the future or to future employment. Nor shall this or any such grant interfere with your right or the Company's right to terminate such employment relationship at any time, with or without cause, to the extent permitted by applicable laws and any enforceable agreement between you and the Company. Future grants, if any, will be at the sole discretion of Motorola, including, but not limited to, the timing of any grant, the amount of the award, vesting provisions, and the exercise price.

### No Relation to Other Benefits/Termination Indemnities

Your acceptance of this award and participation under the Plan is voluntary. The value of your stock option awarded herein is an extraordinary item of compensation outside the scope of your employment contract, if any. As such, the stock option is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension, or retirement benefits or similar payments, notwithstanding any provision of any compensation, insurance agreement or benefit plan to the contrary.

### Agreement Following Termination of Employment

As a further condition of accepting the Options, you acknowledge and agree that for a period of one year following your termination of employment or service, you will not hire, recruit, solicit or induce, or cause, allow, permit or aid others to hire, recruit, solicit or induce, or to communicate in support of those activities, any employee of Motorola or a Subsidiary who possesses Confidential Information of Motorola or a Subsidiary to terminate his/her employment with Motorola or a Subsidiary and/or to seek employment with your new or prospective employer, or any other company.

R3 Award Document                  (                            (                        Page 5 of 7

You agree that upon termination of employment with Motorola or a Subsidiary, and for a period of one year thereafter, you will immediately inform Motorola of (i) the identity of your new employer (or the nature of any start-up business or self-employment), (ii) your new title, and (iii) your job duties and responsibilities. You hereby authorize Motorola or a Subsidiary to provide a copy of this Award Document to your new employer. You further agree to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine your compliance with the terms hereof.

### Substitute Stock Appreciation Right

Motorola reserves the right to substitute a Stock Appreciation Right for your Option in the event certain changes are made in the accounting treatment of stock options. Any substitute Stock Appreciation Right shall be applicable to the same number of shares as your Option and shall have the same Date of Expiration, Exercise Price, and other terms and conditions. Any substitute Stock Appreciation Right may be settled only in common stock.

### Acceptance of Terms and Conditions

By accepting the Options, you agree to be bound by these terms and conditions, the Plan, any and all rules and regulations established by Motorola in connection with awards issued under the Plan, and any additional covenants or promises Motorola may require as a condition of the grant.

### Other Information about Your Options and the Plan

You can find other information about options and the Plan on the Motorola website http://myhr.mot.com/pay_finances/awards_incentives/stock_options/plan_documents.jsp. If you do not have access to the website, please contact Motorola Global Rewards, 1303 E. Algonquin Road, Schaumburg, IL 60196 USA; GBLRW01@Motorola.com; 847-576-7885; for an order form to request Plan documents.

[x] Motorola, Inc.

Printed: March 12, 2008

## STOCK OPTION CONSIDERATION AGREEMENT

**Grant Date: May 08, 2007**

The following Agreement is established to protect the trade secrets, intellectual property, confidential information, customer relationships and goodwill of Motorola, Inc. and each of its subsidiaries (the "Company") both as defined in the Motorola Omnibus Incentive Plan of 2006 (the "2006 Plan").

As consideration for the stock option(s) granted to me on the date shown above under the terms of the 2006 Plan ("the Covered Options"), and Motorola having provided me with Confidential Information as a Motorola appointed vice president or elected officer, I agree to the following:

1. I agree that during the course of my employment and thereafter, I will not use or disclose, except on behalf of the Company and pursuant to its directions, any Company Confidential Information. Confidential Information means information concerning the Company and its business that is not generally known outside the Company. Confidential Information includes: (i) trade secrets; (ii) intellectual property; (iii) the Company's methods of operation and Company processes; (iv) information regarding the Company's present and/or future products, developments, processes and systems, including invention disclosures and patent applications; (v) information on customers or potential customers, including customer's names, sales records, prices, and other terms of sales and Company cost information; (vi) Company personnel data; (vii) Company business plans, marketing plans, financial data and projections; and (viii) information received in confidence by the Company from third parties. Information regarding products or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company or one of its affiliates is considering for broader use, shall not be deemed generally known until such broader use is actually commercially implemented.

2. I agree that during my employment and for a period of one year following my termination of employment for any reason, I will not hire, recruit, solicit or induce, or cause, allow, permit or aid others to hire, recruit, solicit or induce, or to communicate in support of those activities, any employee of the Company who possesses Confidential Information of the Company to terminate his/her employment with the Company and/or to seek employment with my new or prospective employer, or any other company.

3. I agree that during my employment and for a period of one year following the termination of my employment for any reason, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, solicit or participate in soliciting, products or services competitive with or similar to products or services offered by, manufactured by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer for such products or services and with which I had direct or indirect contact regarding those products or services or about which I learned Confidential Information at any time during the two years prior to my termination of employment with the Company.

4. I agree that by accepting the Covered Options, if I violate the terms of paragraphs 1 through and including 3 of this Agreement, then, in addition to any other remedies available in law and/or equity, all of my vested and unvested

R3 Award Document                                                                                    Page 6 of 7

Covered Options will terminate and no longer be exercisable, and for all Covered Options exercised within one year prior to the termination of my employment for any reason or anytime after termination of my employment for any reason, I will immediately pay to the Company the difference between the exercise price on the date of grant as reflected in the Award Document for the Covered Options and the market price of the Covered Options on the date of exercise (the "spread").

5.  The requirements of this agreement can be waived or modified only upon the prior written consent of Motorola, Inc. I acknowledge that the promises in this Agreement, not any employment of or services performed by me in the course and scope of that employment, are the sole consideration for the Covered Options. I agree the Company shall have the right to assign this Agreement which shall not affect the validity or enforceability of this Agreement. This Agreement shall inure to the benefit of the Company assigns and successors.

6.  I agree that during my employment and for a period of one year following the termination of my employment for any reason, I will immediately inform the Company of (i) the identity of my new employer (or the nature of any start-up business, consulting arrangements or self-employment), (ii) my new title, and (iii) my job duties and responsibilities. I hereby authorize the Company to provide a copy of this Agreement to my new employer. I further agree to provide information to the Company as may from time to time be requested in order to determine my compliance with the terms of this Agreement.

7.  I acknowledge that the harm caused to the Company by the breach or anticipated breach of paragraphs 1, 2, and/or 3 of this Agreement will be irreparable and I agree the Company may obtain injunctive relief against me in addition to and cumulative with any other legal or equitable rights and remedies the Company may have pursuant to this Agreement, any other agreements between me and the Company for the protection of the Company's Confidential Information, or law, including the recovery of liquidated damages. I agree that any interim or final equitable relief entered by a court of competent jurisdiction, as specified in paragraph 10 below, will, at the request of the Company, be entered on consent and enforced by any such court having jurisdiction over me. This relief would occur without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

8.  With respect to the Covered Options, this Agreement is my entire agreement with the Company. No waiver of any breach of any provision of this Agreement by the Company shall be construed to be a waiver of any succeeding breach or as a modification of such provision. The provisions of this Agreement shall be severable and in the event that any provision of this Agreement shall be found by any court as specified in paragraph 10 below to be unenforceable, in whole or in part, the remainder of this Agreement shall nevertheless be enforceable and binding on the parties. I also agree that the court may modify any invalid, overbroad or unenforceable term of this Agreement so that such term, as modified, is valid and enforceable under applicable law. Further, I affirmatively state that I have not, will not and cannot rely on any representations not expressly made herein.

9.  I accept the terms of this Agreement and the above option(s) to purchase shares of the Common Stock of the Company, subject to the terms of this Agreement, the 2006 Plan, and any Award Document issued pursuant thereto. I am familiar with the 2006 Plan and agree to be bound by it to the extent applicable, as well as by the actions of the Company's Board of Directors or any committee thereof.

10. I agree that this Agreement and the 2006 Plan, and any Award Document issued pursuant thereto, together constitute an agreement between the Company and me. I further agree that this Agreement is governed by the laws of Illinois, without giving effect to any state's principles of Conflicts of Laws, and any legal action related to this Agreement shall be brought only in a federal or state court located in Illinois, USA.

(End of the Consideration Agreement)

**The recipient has accepted the terms of the Agreement on May 25, 2007**

# EXHIBIT 9

R3 Award Document                    (                                    (                    Page 1 of 8

### How to use this document

The first thing you will see on this website is your Restricted Stock Unit ("RSU") Award Document ("Award Document"). This shows the grant date at the top of the first page and describes the terms of the Award. After reviewing the Award Document, you are required to "electronically sign" the Award Document as a condition of the grant.

In other words, the RSUs will not become yours unless you sign the Award Agreement within 30 days of the date of your email notification for this RSU grant.

At the bottom of the Award Document, there is a place for you to indicate that you either "Accept" or "Reject" its terms. "Signing" and agreeing to be bound by the terms of the Award Document will be done by you when you write "Accept" in the appropriate box and confirm your choice by clicking the "Accept" button. If you write and click that you "Accept," the RSUs will become yours. By accepting, all the terms of the Award Document will apply and the Award Document will be a binding contract between you and Motorola. If you "Reject," the RSUs will revert back to Motorola and will NOT become yours. You will forfeit them permanently. If you exit this site without having marked either the "Accept" or "Reject" button, nothing will happen for the first 30 days following the date of your email notification for this RSU grant. But if you have still not taken action within 30 days of the date of your email notification, your inaction will be treated as a "Reject" and on the 31st day after the date of your email notification you will forfeit the RSUs permanently.

If you "Accept" the Award Document and thus receive the RSUs, you will be able to view the Award Document on the website in the future. Even so, we strongly recommend that you print out a hard copy of the Award Document for your records. If you "Reject" the Award Document or do nothing and thus forfeit the RSUs, on the 31st day after the date of your email notification you will lose the ability to access the information on the website regrding these RSUs. To print the Award Document, right click now. Select "Print" from the list. Select the desired printer and click "Print." (NOTE: YOU WILL NOT HAVE ACCESS TO THIS INTERNAL WEB SITE ONCE YOU LEAVE MOTOROLA.)

---

Motorola Confidential Proprietary                                    (Beginning of the Award Document)

# RESTRICTED STOCK UNIT AWARD AGREEMENT

This Restricted Stock Units Award (the "Award") is made this October 16, 2007 ("Date of Grant"), by Motorola, Inc. (the "Company" or "Motorola") to Michael Fenger (the "Grantee").

WHEREAS, Grantee is receiving the Award under the Motorola Omnibus Incentive Plan of 2006, as amended (the "2006 Incentive Plan");

WHEREAS, the Award is being made as a special grant of Motorola restricted stock units authorized by the Board of Directors and the Board's Compensation and Leadership Committee (the "Compensation Committee"); and

WHEREAS, it is a condition to Grantee receiving the Award that Grantee electronically accept the terms, conditions and Restrictions applicable to the restricted stock units as set forth in this agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the Company hereby awards restricted stock units to Grantee on the following terms and conditions:

1. **Award of Restricted Stock Units** The Company hereby awards to Grantee a total of Twenty-Five Thousand (25,000) Motorola restricted stock Units (the " Units") subject to the terms and conditions set forth below. All Awards shall be paid in whole shares of Motorola Common Stock ("Common Stock"); no fractional shares shall be credited or delivered to Grantee.

2. **Restrictions.** The Units are being awarded to Grantee subject to the transfer and forfeiture conditions set forth below (the "Restrictions") which shall lapse, if at all, as described in Section 3 below. For purposes of this Award, the term Units includes any additional Units granted to the Grantee with respect to Units, still subject to the Restrictions.

   a. Grantee may not directly or indirectly, by operation of law or otherwise, voluntarily or involuntarily, sell, assign, pledge, encumber, charge or otherwise transfer any of the Units still subject to Restrictions. The Units shall be forfeited if Grantee violates or attempts to violate these transfer Restrictions. Motorola shall have the right to assign this Agreement, which shall not affect the validity or enforceability of this Agreement. This Agreement shall inure to the benefit of assigns and successors of Motorola.

   b. Any Units still subject to the Restrictions shall be (x) automatically forfeited upon the Grantee's termination of employment with Motorola or a Subsidiary for any reason other than death, Total and Permanent Disability, or Involuntary Termination due to (i) a Divestiture or (ii) for a reason other than for Serious Misconduct, and (y) at the discretion of the Compensation Committee forfeited, if the Grantee is not an appointed vice president or officer of Motorola at the end of the "Restriction Period" as defined below. For purposes of this Agreement, a "Subsidiary" is any corporation or other entity in which a 50 percent or greater interest is held directly or indirectly by Motorola and which is consolidated for financial reporting purposes. Total and Permanent Disability is defined in Section 3(a).

   c. If Grantee is a vice president or elected officer on the date of the Award, or has been approved to become a vice president or elected officer on the date of the Award, and Grantee engages in any of the following conduct, in addition to all remedies in law and/or equity available to the Company or any Subsidiary, Grantee shall forfeit all restricted stock units under the Award whose Restrictions have not lapsed, and, for all restricted stock units under the Award whose Restrictions have lapsed, Grantee shall immediately pay to the Company the Fair Market Value (as defined in paragraph 7 below) of Motorola Common Stock ("Common Stock") on the date(s) such Restrictions lapsed, without regard to any taxes that may have been deducted from such amount. For purposes of subparagraphs (i) through and including (iii) below, "Company" or "Motorola" shall mean Motorola Inc. and/or any of its Subsidiaries:

      i. During the course of Grantee's employment and thereafter, Grantee uses or discloses, except on behalf of the Company and pursuant to the Company's directions, any Company Confidential Information. "Confidential Information" means information concerning the Company and its business that is not generally known outside the Company, and includes (A) trade secrets; (B) intellectual property; (C) the Company's methods of operation and Company processes; (D) information regarding the Company's present and/or future products, developments, processes and systems, including invention disclosures and patent applications; (E) information on customers or potential customers, including customers' names, sales records, prices, and other terms of sales and Company cost information; (F) Company personnel data; (G) Company business plans, marketing plans, financial data and

projections; and (H) information received in confidence by the Company from third parties. Information regarding products, services or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company or one of its affiliates is considering for broader use, shall be deemed not generally known until such broader use is actually commercially implemented; and/or

    ii.   During Grantee's employment and for a period of one year following the termination of Grantee's employment for any reason, Grantee hires, recruits, solicits or induces, or causes, allows, permits or aids others to hire, recruit, solicit or induce, or to communicate in support of those activities, any employee of the Company who possesses Confidential Information of the Company to terminate his/her employment with the Company and/or to seek employment with Grantee's new or prospective employer, or any other company; and/or

    iii.   During Grantee's employment and for a period of one year following the termination of Grantee's employment for any reason Grantee, directly or indirectly, on behalf of Grantee or any other person, company or entity, solicits or participates in soliciting, products or services competitive with or similar to products or services offered by, manufactured by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer for such products or services and with which Grantee had direct or indirect contact regarding those products or services or about which Grantee learned Confidential Information at any time during the two years prior to Grantee's termination of employment with the Company.

    d.   If Grantee is not a vice president or elected officer on the date of the Award, or has not been approved to become a vice president or elected officer on the date of the Award, and Grantee engages in any of the conduct outlined in paragraph 2(c)(i) or (ii) above, in addition, to all remedies in law and/or equity available to the Company or any Subsidiary, Grantee shall forfeit all restricted stock units under the Award whose Restrictions have not lapsed, and, for all restricted stock units under the Award whose Restrictions have lapsed, Grantee shall immediately pay to the Company the Fair Market Value (as defined in paragraph 7 below) of Motorola Common Stock ("Common Stock") on the date(s) such Restrictions lapsed, without regard to any taxes that may have been deducted from such amount. For purposes of paragraphs 2(c)(i) and (ii) above, "Company" or "Motorola" shall mean Motorola, Inc. and/or any of its Subsidiaries.

    e.   The Company will not be obligated to pay Grantee any consideration whatsoever for forfeited Units.

3.  **Lapse of Restrictions.**

    a.   Except as set forth in Section 3(b) below, the Restrictions applicable to the Units shall lapse, as long as the Units have not been forfeited as described in Section 2 above, as follows:

        i.   50% on April 16, 2010

        ii.   50% on October 16, 2012

        iii.   If a Change in Control of the Company occurs and the successor corporation (or parent thereof) does not assume this Award or replace it with a comparable award; provided, further, that with respect to any Award that is assumed or replaced, such assumed or replaced awards shall provide that the Restrictions shall lapse for any Participant that is involuntarily terminated (for a reason other than "Cause") or quits for "Good Reason" within 24 months of the Change in Control. For purposes of this paragraph, the terms "Change in Control", "Cause" and "Good Reason" are defined in the 2006 Incentive Plan;

        iv.   Upon termination of Grantee's employment by Motorola or a Subsidiary by Total and Permanent Disability. "Total and Permanent Disability" means for (x) U.S. employees, entitlement to long term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan or a determination of a permanent and total disability under a state workers compensation statute and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations; or

        v.   If the Grantee dies.

    b.   In the case of Involuntary Termination due to a Divestiture or for a reason other than for Serious Misconduct before the expiration of the Restriction Period, if the Units have not been forfeited as described in Section 2 above, then the Restrictions shall lapse on a pro rata basis determined by dividing (i) the number of completed full years of service by the Grantee from the Award Date to the employee's date of termination by (ii) the total length of the Restriction Period.

c.   "Termination due to a Divestiture" for purposes of this Agreement means if Grantee accepts employment with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfer of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary, or if Grantee remains employed by a Subsidiary that is sold or whose shares are distributed to the Motorola stockholders in a spin-off or similar transaction (a "Divestiture").

d.   "Serious Misconduct" for purposes of this Agreement means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

e.   If, during the Restriction Period, the Grantee takes a Leave of Absence from Motorola or a Subsidiary, the Units will continue to be subject to this Agreement. If the Restriction Period expires while the Grantee is on a Leave of Absence the Grantee will be entitled to the Units even if the Grantee has not returned to active employment. "Leave of Absence" means an approved leave of absence from Motorola or a Subsidiary that is not a termination of employment, as determined by Motorola.

f.   To the extent the Restrictions lapse under this Section 3 with respect to the Units, they will be free of the terms and conditions of this Award (other than Section 2(c)).

4.   **Adjustments.**
If the number of outstanding shares of Common Stock is changed as a result of a stock split or the like without additional consideration to the Company, the number of Units subject to this Award shall be adjusted to correspond to the change in the outstanding shares of Common Stock.

5.   **Dividends.**
No dividends (or dividend equivalents) shall be paid with respect to Units credited to the Grantee's account.

6.   **Delivery of Certificates or Equivalent.**
Upon the lapse of Restrictions applicable to the Units, the Company shall, at its election, either (i) deliver to the Grantee a certificate representing a number of shares of Common Stock equal to the number of Units upon which such Restrictions have lapsed, or (ii) establish a brokerage account for the Grantee and credit to that account the number of shares of Common Stock of the Company equal to the number of Units upon which such Restrictions have lapsed.

7.   **Withholding Taxes.**
The Company is entitled to withhold applicable taxes for the respective tax jurisdiction attributable to this Award or any payment made in connection with the Units. Grantee may satisfy any minimum withholding obligation by electing to have the plan administrator retain shares of Common Stock deliverable in connection with the Units having a Fair Market Value on the date the Restrictions applicable to the Units lapse equal to the amount to be withheld. "Fair Market Value" for this purpose shall be the closing price for a share of Common Stock on the day the Restrictions applicable to the Units lapse as reported for the New York Stock Exchange- Composite Transactions in the Wall Street Journal, Midwest edition.

8.   **Voting and Other Rights.**

a.   Grantee shall have no rights as a stockholder of the Company in respect of the Units, including the right to vote and to receive cash dividends and other distributions until delivery of certificates representing shares of Common Stock in satisfaction of the Units.

b.   The grant of Units does not confer upon Grantee any right to continue in the employ of the Company or a Subsidiary or to interfere with the right of the Company or a Subsidiary, to terminate Grantee's employment at any time.

9.   **Agreement Following Termination of Employment.**
Grantee agrees that upon termination of employment with Motorola or a Subsidiary, Grantee will immediately inform Motorola of (a) the identity of any new employer (or the nature of any start-up business or self-employment), (b) Grantee's new title, and (c) Grantee's job duties and responsibilities. Grantee hereby authorizes Motorola or a Subsidiary to provide a copy of this Award Document to Grantee's new employer. Grantee further agrees to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine his/her compliance with the terms hereof.

10.   **Consent to Transfer Personal Data.**
By accepting this award, Grantee voluntarily acknowledges and consents to the collection, use, processing and transfer of personal data as described in this paragraph. Grantee is not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect Grantee's ability to participate in the Plan. Motorola, its Subsidiaries and Grantee's employer hold certain personal information about the Grantee, that may include his/her name, home address and telephone number, date of

birth, social security number or other employee identification number, salary grade, hire data, salary, nationality, job title, any shares of stock held in Motorola, or details of all restricted stock units or any other entitlement to shares of stock awarded, canceled, purchased, vested, or unvested, for the purpose of managing and administering the Plan ("Data"). Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of Grantee's participation in the Plan, and Motorola and/or any of its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, including the United States. Grantee authorizes them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing Grantee's participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on the Grantee's behalf to a broker or other third party with whom the Grantee may elect to deposit any shares of stock acquired pursuant to the Plan. Grantee may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing consent may affect the Grantee's ability to participate in the Plan.

11. **Nature of Award.**
By accepting this Award Agreement, the Grantee acknowledges his or her understanding that the grant of Units under this Award Agreement is completely at the discretion of Motorola, and that Motorola's decision to make this Award in no way implies that similar awards may be granted in the future or that Grantee has any guarantee of future employment. Nor shall this or any such grant interfere with Grantee's right or the Company's right to terminate such employment relationship at any time, with or without cause, to the extent permitted by applicable laws and any enforceable agreement between Grantee and the Company. In addition, the Grantee hereby acknowledges that he or she has entered into employment with Motorola or a Subsidiary upon terms that did not include this Award or similar awards, that his or her decision to continue employment is not dependent on an expectation of this Award or similar awards, and that any amount received under this Award is considered an amount in addition to that which the Grantee expects to be paid for the performance of his or her services. Grantee's acceptance of this Award is voluntary. The Award is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension, or retirement benefits or similar payments, notwithstanding any provision of any compensation, insurance agreement or benefit plan to the contrary.

12. **Remedies for Breach.**
Grantee hereby acknowledges that the harm caused to the Company by the breach or anticipated breach of paragraphs 2(c)(i), (ii) and/or (iii) of this Agreement will be irreparable and further agrees the Company may obtain injunctive relief against the Grantee in addition to and cumulative with any other legal or equitable rights and remedies the Company may have pursuant to this Agreement, any other agreements between the Grantee and the Company for the protection of the Company's Confidential Information, or law, including the recovery of liquidated damages. Grantee agrees that any interim or final equitable relief entered by a court of competent jurisdiction, as specified in paragraph 15 below, will, at the request of the Company, be entered on consent and enforced by any such court having jurisdiction over the Grantee. This relief would occur without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

13. **Acknowledgements.**
With respect to the subject matter of paragraphs 2(c)(i), (ii), and (iii), and paragraphs 12 and 15 hereof, this Agreement is the entire agreement with the Company. No waiver of any breach of any provision of this Agreement by the Company shall be construed to be a waiver of any succeeding breach or as a modification of such provision. The provisions of this Agreement shall be severable and in the event that any provision of this Agreement shall be found by any court as specified in paragraph 15 below to be unenforceable, in whole or in part, the remainder of this Agreement shall nevertheless be enforceable and binding on the parties. Grantee hereby agrees that the court may modify any invalid, overbroad or unenforceable term of this Agreement so that such term, as modified, is valid and enforceable under applicable law. Further, by accepting any Award under this Agreement, Grantee affirmatively states that (s)he has not, will not and cannot rely on any representations not expressly made herein.

14. **Funding.**
No assets or shares of Common Stock shall be segregated or earmarked by the Company in respect of any Units awarded hereunder. The grant of Units hereunder shall not constitute a trust and shall be solely for the purpose of recording an unsecured contractual obligation of the Company.

15. **Governing Law.**
All questions concerning the construction, validity and interpretation of this Award shall be governed by and construed according to the law of the State of Illinois without regard to any state's conflicts of law principles. Any

R3 Award Document                                                           Page 6 of 8

disputes regarding this Award or Agreement shall be brought only in the state or federal courts of Illinois.

16.  **Waiver.**
     The failure of the Company to enforce at any time any provision of this Award shall in no way be construed to be
     a waiver of such provision or any other provision hereof.

17.  **Actions by the Compensation Committee**
     The Committee may delegate its authority to administer this Agreement. The actions and determinations of the
     Compensation Committee or its delegate shall be binding upon the parties.

18.  **Acceptance of Terms and Conditions.**
     By electronically accepting this Award within 30 days after the date of the electronic mail notification by the
     Company to Grantee of the grant of this Award ("Email Notification Date"), Grantee agrees to be bound by the
     foregoing terms and conditions, the 2006 Incentive Plan and any and all rules and regulations established by
     Motorola in connection with awards issued under the 2006 Incentive Plan. If Grantee does not electronically
     accept this Award within 30 days of the Email Notification Date, Grantee will not be entitled to the Units.

19.  **Plan Documents.**
     The 2006 Incentive Plan and the Prospectus for the 2006 Incentive Plan are available at
     http://myhr.mot.com/pay_finances/awards_incentives/stock_options/plan_documents.jsp  or  from  Global
     Rewards, 1303 East Algonquin Road, Schaumburg, IL 60196 (847) 576-7885.

Motorola Confidential Proprietary                                    (End of the Award Document)

R3 Award Document

Motorola Confidential Proprietary

**Printed: March 12, 2008**
**Grant Date: October 16, 2007**

(Beginning of Consideration Agreement)

Motorola Confidential Proprietary

(End of Consideration Agreement)

**The recipient has accepted the terms of the Agreement on November 28, 2007**

FILED: AUGUST 8, 2008
08CV4512
JUDGE ZAGEL
MAGISTRATE JUDGE KEYS

JFB

# EXHIBIT 12

SOP E-60: Protection of Proprietary Information( PI (

Motorola Internal Use

MOTOROLA, INC.
STANDARD OPERATING PROCEDURE

E - 60

# PROTECTION OF PROPRIETARY INFORMATION - POPI

Effective Date:   September 1, 1991      Current Date:   August 19, 1997

Written By:        Vince Rauner
Reviewed By:       Pat Armstrong          Sanjar Ghaem
                   Bernie Banahan         Larry Grow
                   Peter Browne           Dave Hickie
                   Chuck Eger             Jerry Johnson
                   Peggy Eichberger       Ken Johnson
                   Chuck Ekdahl           Pat O'Malley
                   Bob Frith              Martin O'Sullivan
                   Mike Garber            Bob Scallon

Revised By:             Internal Controls Council
Revision Reviewed By:   Ken Johnson
Revision Date:          August 19, 1997

Approved By:            Accounting Policy Council

## PURPOSE

To define a uniform Motorola-wide operating procedure for the identification of proprietary information and protection of the data from inadvertent or unauthorized disclosure, modifica- tion or destruction.

## SCOPE

This operating procedure applies to all employees of Motorola, Inc. and its subsidiaries worldwide.

## CONTENTS

**Exhibit 12**

1.0 References

2.0 Definitions

3.0 Policy

4.0 Responsibility

5.0 POPI Controlled Access Areas

6.0 Procedures


## 1.0 References

1.1 SOP E-62 - Appropriate Use of Computer Resources

1.2 WWCFP A-4 - Record Retention

1.3 WWCFP A-6 - Non-Motorola Use of Motorola Computers

1.4 Motorola Standards of Internal Control (SICs)

1.5 Corporate Security Policies and Procedures (CSPP) #105

1.6 Motorola Electronic Information Security Standards Motorola Information Protection Services Note: Failure to maintain appropriate confidentiality of personnel records and Motorola proprietary information is a Class III infraction of that policy and could result in loss of employment.

## 2.0 Definitions

2.1 Proprietary Information - information useful in the business which: o Motorola keeps confidential to establish legal rights, that is, property rights; o Is not generally known outside Motorola (unless subject to a confidentiality agreement or the terms of a contract with the U.S. Government); o Gives the company a competitive advantage if it is used in the business and therefore, has economic value and benefit to the company. Such types of information include technical and personnel information; sensitive business information such as plans, strategies, financial data; and trade secrets such as techniques, processes, compilations, formulas and patterns. Further included is proprietary information of others in the possession of Motorola.

2.2 POPI Controlled Access Area - Any enclosed floor space which conforms to the requirements specified in Section 5.0 of this Policy. Also refer to Corporate Security Policies and Procedures (CSPP #105) for additional information on physical security requirements.

## 3.0 Policy

3.1 Motorola's policy is to keep secure within the company non- public information which it possesses, except in the case of normal business pursuits, e.g., where the company promotes products, makes announcements or transfers such information in a selective manner under an agreement.

3.2 Some information possessed by the company is of a sensitive nature such that divulging it to outsiders, for example, competitors, would make Motorola less competitive or cause damage. On the other hand, the company does not want to inhibit sharing of information among employees for those who need to know such information to perform their jobs. If information is properly handled it can remain proprietary to the company, and safeguarded for competitive benefit, while at the same time it is being shared for company use.

3.3 The purpose of protection is to prevent inadvertent or wrongful disclosure. The procedures for accomplishing this must be standard throughout the company so that information from one part of the company can be transferred to another part of the company with assurance of protection expected by the organization originating the information.

3.4 All computer and network users, including non-Motorolans accessing Motorola computers, will be held strictly accountable for their activities while using Motorola information processing resources. Actions, including details of files accessed, will be subject to recording and subsequent audit review. Individual users shall be uniquely identified, with explicit authorization to access non-public information enforced at the host system which stores the data. Additional requirements are specified in the Standards of Internal Control and the Electronic Information Security Standards, which provide guidance relating to specific technologies or services, such as E-Mail or EDI.

3.5 The exhibit that follows sets forth minimum safeguards to use. Motorolans with a question should seek an answer from Corporate Security, Corporate Information Security or the Intellectual Property Department, but in any event, take steps to secure sensitive and valuable information, just as one would safeguard one's own valuable property.

3.6 Proprietary information may, on occasion, be provided to the U.S. Government. In that event, the words "Confidential" and "Secret" may be omitted. Instead, the proprietary information will be marked either "Motorola Proprietary" or Motorola Registered Proprietary". In addition and in order to protect the proprietary information in a manner recognized by the U.S. Government legends as set out in the relevant U.S. Government Regulations (e.g., ASPR, FAR, DFAR, etc.) will also be placed on the information being provided.

SOP E-60: Protection of Proprietary Information    PI

## 4.0 Responsibility

4.1 Sector/Group/Subsidiary, General Managers and Corporate Directors will implement and enforce this policy and procedure within their respective business entities. They will cause standards to be set for use of the procedures to protect information originating in their organizations. They will cause training of their people to protect that information and also information their people receive from other organizations within the Company.

4.2 Each employee has a responsibility not to use, or to publish, or to otherwise disclose to others, any proprietary or confidential information of Motorola or its customers or suppliers or other contractors, except as Motorola duties may require. Each employee should report information security breaches to the Corporate Security Department and the local Security Department.

4.3 Corporate Audit has the responsibility to monitor compliance with this procedure and determine that suitable tools and training are available in audited departments.

## 5.0 POPI Controlled Access Areas

5.1 An area properly designated as POPI access controlled is subject to less stringent physical storage requirements than those specified elsewhere in this policy. The use of this policy exemption is meant to be very rare and should be considered only for highly unusual and technical functions (i.e., 24-hour engineering labs and design centers), where printed schematics or other shared data cannot be easily removed from view. By definition, individual offices may not be designated as POPI Controlled Access Areas.

5.2 The occupants of a POPI Controlled Access Area must adhere to all other Motorola policy requirements. These include but are not limited to requirements regarding POPI document classification, EISS, and internal control standards (SICs) governing loss prevention.

5.3 In order for an area to be considered POPI Controlled Access, the following criteria are required:

5.3.1 A written plan for each POPI Controlled Access Area which at a minimum addresses the business reason for the designation as well as relevant self-audit and security procedures. Each plan must be approved in writing by the appropriate Sector/ Group Security Manager, Internal Controls Manager, Controller and Operations Vice President.

5.3.2 Documented and independent self-audits of the area must be performed at least quarterly to ensure compliance with POPI and security standards. Repeat or serious infractions must result in the temporary revocation of the POPI Controlled Access designation until adequate corrective action can be demonstrated.

SOP E-60: Protection of Proprietary Information    )PI

5.3.3 A separate and restricted 24-hour security system must be in place which uniquely identifies users and logs their access by date/time. In areas surrounded by false ceilings and/or walls which do not extend to the ceiling, motion detectors must supplement the separate security access system.

5.3.4 Janitorial services within the area must either be accompanied by Security personnel or be performed under supervision during normal working hours.

## 6.0 Procedures

6.1 The following schedule provides information with respect to the treatment to be given to Motorola classified documents. It is organized by type of classification. Within each classification it is then organized by the type of action and the procedures that must accompany that specific action.

-------------------------------------

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
MOTOROLA GENERAL BUSINESS INFORMATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| ACTION PERFORMED | PROCEDURES FOR MANAGING INFORMATION |
|---|---|
| Classification Basis - (Business entity provides for examples for its personnel) | All Motorola information of business relevance not otherwise classified. |
| Classifier | Developer or compiler of the information. |
| Marking | Information is not marked or labeled. |
| Marking Exception - (For information revealed to US government employees under an NDA or US Gov. Regs. | N/A |
| Access | All Motorolans and non-Motorolans having |

SOP E-60: Protection of Proprietary Information    )PI

a legitimate business
need for this
information.

| | |
|---|---|
| Handling During Travel | No extra precautions necessary. |
| Revisions | No specific requirements. |
| Copying | No restrictions. |
| Distribution Internal | Any appropriate method. |
| Distribution External | Any appropriate method. |
| Storage | No specific requirements. |
| Destruction | No specific requirements. |
| Downgrading | No specific requirements. |

- - - - - - - - - - - - - - - - - - - - - - - - -
MOTOROLA INTERNAL USE ONLY
- - - - - - - - - - - - - - - - - - - - - - - - -

ACTION PERFORMED
* * * * * * * * * * * * * * * *

PROCEDURES FOR
MANAGING INFORMATION
* * * * * * * * * * * * * * * * * * * *

Classification Basis
- (Business entity
provides for examples
for its personnel)

Business, technical,
financial and
personnel information
which is written,
oral, in electronic
media or physical
form, and which, if
communicated outside
Motorola, could
benefit competitors

|  |  |
|---|---|
|  | at Motorola's expense. |
| Classifier | Developer or compiler of the information. |
| Marking | "MOTOROLA INTERNAL USE ONLY" prominently marked on at least the top page.<br><br>For digital information, application systems must enforce the marking in all print routines and graphics displays, and where practical, embedded in files.<br><br>Classification expiration date is optional. |
| Marking Exception - (For information revealed to US government employees under an NDA or US Gov. Regs. | N/A |
| Access | All Motorolans and non-Motorolans having a need for this information, but only the specific information needed. |
| Handling During Travel | Keep in control. |
| Revisions | Revisions to original |

SOP E-60  Protection of Proprietary Information    )PI                        (

|  |  |
|---|---|
|  | information require the approval of the classifier. |
| Copying | Permitted by authorized user, but maintain clear markings, including digital copies. |
| Distribution Internal | Company mail (folded or in envelop), general mail, approved electronic mail and electronic file transfer systems. |
| Distribution External | Public or private mail carrier, approved public E-Mail or electronic file transfer system. |
| Storage | Protect from loss to non-Motorolans.<br><br>Digital information must have access control. |
| Destruction | No special requirements.  Insure that material cannot be acquired by non-Motorolans.<br><br>Digital files must be deleted or erased. |
| Downgrading | By date stated in the information or at the end of the |

SOP E-60: Protection of Proprietary Information    OPI

information retention
period per policy
WWCFP A-4, or as
designated at the
request of the
classifier.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
MOTOROLA CONFIDENTIAL PROPRIETARY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ACTION PERFORMED                    PROCEDURES FOR
* * * * * * * * * * * * * * * *     MANAGING INFORMATION
                                    * * * * * * * * * * * * * * * * * * *

Classification Basis                Business, technical,
- (Business entity                  financial and
provides for examples               personnel information
for its personnel)                  which is written,
                                    oral, in electronic
                                    media or physical
                                    form, and which has
                                    significant value to
                                    the company.  It
                                    should be limited to
                                    persons with a need
                                    to know.

Classifier                          Manager or higher of
                                    the organization
                                    developing the
                                    information.

Marking                             "MOTOROLA
                                    CONFIDENTIAL
                                    PROPRIETARY"
                                    prominently marked on
                                    the top page and each
                                    other page, as
                                    reasonable.

                                    For digital
                                    information,

SOP E-60: Protection of Proprietary Information    OPI

| | application systems must enforce the marking in all print routines and graphics displays and where practical, embedded in files. |
| | |
| | Classification expiration date is optional. |
| Marking Exception - (For information revealed to US government employees under an NDA or US Gov. Regs. | MOTOROLA PROPRIETARY INFORMATION. In place on MCP above. |
| Access | Motorolans with a need to know and non-Motorolans with a need to know, but subject to a confidentiality agreement and consistent with Corporate/Sector/Group SOP's. |
| Handling During Travel | Keep in possession or locked. |
| Revisions | Revisions to original information require the approval of the classifier. |
| Copying | Permitted by authorized user, but maintain clear markings, including digital copies. |

Distribution Internal

Printed documents by company mail or approved outside carriers, opaque envelope. Double envelope used in judgment of sender.

For digital information, approved electronic mail and electronic file transfer systems with access authentication control.

Distribution External

Public or private mail carrier with double envelope, MIS approved public E-Mail or electronic file transfer system. Files must be encrypted when transmitting over unprotected communications systems.

Storage

Information must be kept out of view of persons not having a need to know. When printed information is not in use, it must be stored in a locked cabinet, desk or approved controlled access area.

Digital information

SOP 6-60: Protection of Proprietary Information )PI

|                |                                                                                                                                      |
| -------------- | ------------------------------------------------------------------------------------------------------------------------------------ |
|                | should have access control and files should be locked for access only by authorized individuals.                                     |
| Destruction    | Printed materials must be deposited in secure document receptacles or shredded.                                                       |
|                | Digital files must be erased through MIS approved computerized disk utilities which destroy the data.                                 |
| Downgrading    | By date stated in the information or at the end of the information retention period per policy WWCFP A-4, or as designated at the request of the classifier. |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MOTOROLA REGISTERED SECRET PROPRIETARY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|                                                                                     |                                                                                                  |
| ----------------------------------------------------------------------------------- | ------------------------------------------------------------------------------------------------ |
| ACTION PERFORMED<br>* * * * * * * * * * * * * * * *                                  | PROCEDURES FOR MANAGING INFORMATION<br>* * * * * * * * * * * * * * * * * * * *                    |
| Classification Basis - (Business entity provides for examples for its personnel)     | Business, technical, financial, trade secret and personnel information which is written, oral, in electronic media or |

SOP E-60: Protection of Proprietary Information     PI

|  |  |
|---|---|
|  | physical form, and which is of a most sensitive nature. |
|  | Knowledge must be limited to selected individuals. |
| Classifier | Manager or higher of the organization developing the information. |
| Marking | "MOTOROLA REGISTERED SECRET PROPRIETARY" on a colored cover sheet and prominently displayed on the top and bottom of each page.  The cover sheet should name the individual custodian of that copy and bear a registration number tracked by the Classifier. |
|  | For digital information, application systems must enforce the marking in all print routines and graphics displays, and where practical, embedded in files. |
| Marking Exception – (For information revealed to US government employees under an NDA or US Gov. Regs. | "MOTOROLA REGISTERED PROPRIETARY INFORMATION" in place of MRSP above. |

SOP E-60: Protection of Proprietary Information OPI

| | |
|---|---|
| Access | Motorolans with a need to know and non-Motorolans with a need to know, but subject to a confidentiality agreement. Approval for access must be at the V.P. level. Distribution lists maintained by originator. |
| Handling During Travel | Keep in possession or locked. Avoid working with or exposing material while on public transportation. |
| Revisions | Revisions to original information require the approval of the classifier. |
| | Approval must be in writing and all changes must be documented. |
| Copying | Permitted by authorized user upon permission of originator, but maintain clear markings, including digital copies. All copies must be registered and logged. |
| Distribution Internal | Printed documents |

SOP E-60: Protection of Proprietary Information OPI

must be hand-
carried, if possible.
Double envelope is
required, with inner
envelope marked "open
by addressee only".
Company mail or
approved, secure
outside carrier, with
same packaging
requirements.

For digital
information, MIS
approved secure
electronic systems,
with access
authentication
control and end-to-
end encryption.

Distribution External          Public or private
mail carrier with
double envelope.
Registered return
receipt is required.
Any electronic
transmission,
including file
transfer or E-Mail,
must be encrypted
end- to-end with MIS
approved systems.

Storage                        When is use, kept
under sight control,
and when stored,
placed in locked
cabinets or desks.

Digital information
must be encrypted,
with de-encryption

|  |  |
|---|---|
|  | only available to designated, authorized individuals.  All computer systems must have access control. |
| Destruction | Material must be returned to the originator. |
|  | Digital files must be erased through MIS approved computerized utilities which destroy the data. Records must be kept of destruction. |
| Downgrading | Only as authorized in writing by the originator. |

Motorola Internal Use Only

MOTOROLA, INC.
STANDARD OPERATING PROCEDURE (SOP)
E - 62

# APPROPRIATE USE OF COMPUTER RESOURCES

Effective Date: January 1, 1987

Revised Date: May 25, 2006

Revised By:    Appropriate Use of Computer Resources Task Force
(Corporate Law, Human Resources, and
Motorola Information Protection Services)

Reviewed By:      Corporate Law
Human Resources
Information Technology - Infrastructure Services    ITIS
Motorola Information Protection Services    MIPS

Approved By: Accounting Policy Council

## PURPOSE

1.0    To define the policy and responsibilities necessary to ensure appropriate, efficient and responsible use of computer resources.
2.0    To ensure that computer resources are used in compliance with applicable laws and software license agreements.
3.0    To define the privacy policy applicable to Motorola's computer resources.

## SCOPE

This policy applies to all employees and non-Motorolans who have access to Motorola's electronic information assets.   . It applies whether access is on-site or from remote locations. It applies to all data systems and equipment that contains Motorola data and/or is used in support of Motorola business, whether managed by Motorola or a third party. Non-Motorola users who only use computer resources that are intended for public access are exempt from the provisions of this policy.
This policy supercedes all prior versions of this SOP.

## CONTENTS

1.0 References
2.0 Definitions
3.0 Policy
4.0 Responsibilities
5.0 Appendix
    5.1. Examples of Appropriate and Inappropriate Use
    5.2. Required Usage Notice

## 1.0 REFERENCES

1.1. Human Resource Policies, including
    Progressive Discipline and Conduct
    Detrimental to Motorola's Interests, and Employee Handbooks
1.2 Code of Business Conduct
1.3 Internet Web Site Terms of Use and Privacy Policy
1.4 SOP E-60 Protection of Proprietary Information
1.5 Educational materials related to this policy

## 2.0 DEFINITIONS

2.1    Motorola Computer Resources are computers, peripherals, printers, plotters, scanners, modems, internal and external networks, electronic mail, facsimile devices/systems, paging devices/systems, and other computer devices/systems owned or leased by Motorola, whether used by employees, agents of Motorola, or authorized non-Motorolans. For purposes of this policy the scope also includes non-Motorola computer resources (e.g. Internet, business partner Computer Resources) when accessed via Motorola computer resources.

2.2    This policy includes any piece of electronic equipment or accessory that has the ability to store data that belongs to Motorola.  (examples include but are not limited to:  Servers, workstations, personal computers, laptops, persona digital assistants (PDA's, smartphones) and mobile phones)

## 3.0 STATEMENT OF POLICY

3.1 Motorolans and authorized non-Motorolans are empowered to appropriately use Motorola Computer Resources in ways that will accomplish company goals and initiatives. Users of these resources are expected to act ethically and professionally wherever and whenever the resources are used. The use of Motorola Computer Resources must comply with all applicable policies and procedures, including but not limited to the Code of Business Conduct, Human Resource policies, employee handbooks, non-disclosure agreements and applicable laws.

3.2 Occasional personal use of Motorola Computer Resources is allowed if such use does not interfere with work responsibilities and other required business activities, business operations, or system performance. Personal use of these resources must not violate other provisions of this policy including Section 3.1 and Appendix 5.1.

3.3 All Motorolans must use a Motorola provided (owned or leased) computer as their primary computer for conducting Motorola business.  Exceptions to this must be approved by a business controller and a vice president of IT.
   *Note: A partial listing of appropriate and inappropriate uses is found in Appendix 5.1.*

3.4 All software stored in or executed on Motorola Computer Resources must be used in accordance with applicable license agreements. Public domain and shareware software are allowed only after ensuring the necessary rights have been acquired and fees have been paid.

3.5    It is the policy of Motorola to protect confidential, sensitive or critical information owned by Motorola or in Motorola custody, and also to protect specific

information as required by applicable law. Sensitive information must be properly classified, and protected according to SOP E-60, Protection of Proprietary Information (POPI).

3.6   Motorola Computer Resource transactions must be traceable to the initiating user.

3.7   Each user must be aware of the provisions of this policy before being given access to Motorola Computer Resources.

3.8   Motorola reserves the right to audit, access and inspect electronic communications of any devices connecting to the Motorola network, and any data created, stored or transmitted in any form on these devices in accordance with applicable law. Motorola retains ownership for all Motorola data regardless of who owns the device or media on which it is stored.  Motorola also reserves the right to add necessary files and modify the configuration of any connected computer or device to ensure the security and integrity of its computer resources. A usage notice (Appendix 5.2) must be displayed on computer workstations and remote data network access points before a user may login.

3.9   Appropriate disciplinary or other action, in accordance with Motorola policies and applicable law, and/or legal action will be taken against individuals found to have violated this policy. Such action may include termination of employment or contract.

## 4.0 RESPONSIBILITIES

4.1  Human Resources will:
   4.1.1   Lead the policy formation, maintenance, and enforcement activities.
   4.1.2   Maintain educational materials and guidelines which communicate the appropriate use policy and on-line privacy expectations.
   4.1.3   Ensure that new and existing employees receive education on SOP E-62.
   4.1.4   Ensure that other appropriate organizations within their business units are cognizant of their responsibilities to communicate SOP E-62 requirements to agents, business partners, and contractors.
   4.1.5   Lead the specification of enforcement mechanisms.

4.2  Law department:
   4.2.1   Will provide legal guidance in the development and maintenance of an electronic commerce privacy statement for public computer resources (e.g. Internet web sites) in conjunction with the Marketing department.
   4.2.2   Will support investigations of inappropriate use of Motorola's Computer Resources as necessary.

4.3  Corporate Contracts, Software & Technology Acquisition and Supply
Management organizations:

4.3.1    Will review business processes in their organization to determine
who has principal contracting responsibility for agreements with
contractors, consultants or agents.

4.3.2    Will ensure that appropriate language is incorporated into agreements
with non-Motorola organizations covering:

4.3.2.1  Compliance with this policy.

4.3.2.2  Inclusion of the usage notice (Appendix 5.2) in all outsourced
connections to Motorola Computer Resources (e.g., Internet Service
Providers).

4.4  Network and system administrators:

4.4.1    Will ensure that the usage notice (Appendix 5.2) appears on computer
workstations and remote data network access points.

4.4.2    Must provide a unique user ID (computer account) and an appropriate
authentication mechanism (e.g., password, security token/card) for each
employee having access to Motorola computer resources.

4.4.3    Will participate and support investigations of potential inappropriate use
as directed by responsible management as further described in
paragraph 4.7 below.

4.5  Department managers and individuals responsible for non-Motorolans:

4.5.1    Must ensure individuals reporting to them are aware of all provisions of
this policy before authorizing any access to computer resources.

4.5.2    Are responsible for the informed interpretation of the provisions of this
policy, including the determination of the appropriateness of all non-
business uses by individuals reporting to them.

4.5.3    May not grant exceptions for those activities that are specifically
prohibited in this policy.

4.6  Employees and authorized non-Motorola users:

4.6.1    Must comply with this policy.

4.7  Cyber Incident Response Team, Security departments, and Internal Control
organizations:

4.7.1    Will participate in investigations as requested by the Human Resources
or Law departments according to jointly-developed procedures.

## 5.0 APPENDIX

### 5.1 Examples of Appropriate and Inappropriate Use

Some examples of appropriate non-business uses of Motorola's Computer Resources include but are not limited to:
- Support of approved volunteer work in the community
- Doing homework for a continuing education course
- Compiling research for a project in a post-graduate program
- Conducting on-line banking
- Performing on-line financial management
- Doing on-line shopping

Some examples of non-appropriate use of Motorola's Computer Resources include but are not limited to:
- Disclosing confidential or sensitive information which is owned by or entrusted to Motorola to unauthorized recipients
- Misusing copyrighted material or other violation of copyrights held by Motorola or others
- Misusing trademarks or service marks of Motorola or other organizations
- Infringing on intellectual property rights
- Use for any illegal purpose
- Communicating in ways that disparage other companies' products or services (excluding objective reports of substantiated fact with limited internal distribution)
- Communicating information that could be perceived as official Motorola positions or endorsements without proper management approval
- Communicating using confrontational or improper language or using statements that are defamatory
- Creating, storing, transmitting, or viewing illegal, offensive or inappropriate material, including pornography
- Participating in any activity which could be interpreted as harassment, discrimination or intimidation of others
- Using electronic mail to transmit offensive or inappropriate materials, including pornography, inappropriate jokes or cartoons, and games
- Originating or distributing chain letters or other mass mailings
- Misrepresenting an individual's identity or the source of communications or information
- Attempting to break into or monitor any Computer Resource without proper authorization, whether within Motorola or another organization
- Accessing confidential or sensitive information on computer resources without authorization
- Appropriating, disclosing, accessing, distributing, storing, collecting or processing any individual personal information or data in violation of data protection or privacy laws
- Promoting personal political or religious positions to fellow employees in the

workplace
- Participating or engaging in activities that violate the law, the Code of Business Conduct, Key Beliefs, or Motorola policies
- Operating a personal business
- Soliciting on behalf of charitable, commercial, or internal organizations, or otherwise, except as provided by appropriate Motorola HR policies/procedures on solicitation and distribution
- Export or import of any government controlled information or software to or from unauthorized locations or persons without appropriate licenses or permits
- Enabling non-Motorolans who have not signed the proper non-disclosure agreements with Motorola to regularly access a Motorola provided network connection.

## 5.2  Required Usage Notice

The following notice must be displayed on all workstations and interactive network access points before a user may login. The notice must be in English, however other languages may be used simultaneously if deemed appropriate by local Human Resource departments.

This computer resource is the property of Motorola. Authorized persons may use Motorola computer resources only for approved purposes. Misuse or misappropriation of company networks and systems is prohibited.

Motorola reserves the right to audit, access and inspect electronic communications and data created, stored, or transmitted on its computer resources in accordance with applicable law.

Motorola also reserves the right to add necessary files and modify the configuration of any connected computer or system to ensure the security and integrity of its computer resources.

BY COMPLETING THE LOGIN PROCESS YOU ARE ACKNOWLEDGING AND CONSENTING TO THE PROVISIONS OF THIS NOTICE AND POLICY SOP E-62. IF YOU ARE NOT AN AUTHORIZED USER, PLEASE DISCONTINUE THE LOGIN PROCESS NOW.
If you need further information, please visit banner.mot.com or contact your local help desk.

| (M) **MOTOROLA** | **Policy Signature Form** |
|---|---|

I hereby acknowledge that I have been provided with a copy of the following Policies:

- Protection of Proprietary Information (POPI), SOP E-60

- Appropriate Use of Computer Software, SOP E-62

I understand that I must read and abide by the above materials as an ongoing condition of employment, and I certify that if I do not understand the materials, I will seek clarification from my Supervisor or Human Resources Personnel.

| WITNESS | EMPLOYEE |
|---|---|
| Signature<br>*Rochelle Russo* | Signature<br>*Michael J Fenger* |
| Typed or Printed Name<br>*Rochelle Russo* | Typed or Printed Name<br>*Michael J Fenger* |
| Date<br>*9-23-02* | Date<br>*9-23-02* |